Thomas A. JOSEPH, Acumark, Inc., Appellees

v.

The SCRANTON TIMES L.P., the Times Partner, and Edward Lewis, Appellants.

Superior Court of Pennsylvania.

Argued Feb. 27, 2008.

Filed Sept. 18, 2008.

Reargument Denied Nov. 26, 2008.

Walter T. McGough, Jr., Pittsburgh, for appellants.

George Croner, Philadelphia, for appellee.

BEFORE: FORD ELLIOTT, P.J., DONOHUE, and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 This is an appeal from the November 16, 2006 judgment entered in the Court of Common Pleas, Luzerne County, in favor of Thomas A. Joseph (Appellee Joseph) and Acumark, Inc., (Appellee Acumark) (collectively Appellees) in their defamation action. The Scranton Times LP, The Times Partner, and Edward Lewis (collectively Appellants) claim that the trial court erred in entering judgment in favor of Appellees because Appellees failed to meet their constitutionally-mandated burdens to prove falsity and fault and that they failed to prove injury as a result of the alleged

defamatory statements. Upon review, we affirm the judgment.

*FACTS*

¶ 2 The Internal Revenue Service Criminal Investigation Unit and the Pennsylvania State Police (PSP) Bureau of Criminal Investigation Division, Organized Crime Northeast Section, were conducting a joint investigation of William D'Elia, the reputed head of the Bufalino crime family of northeastern Pennsylvania. As part of the investigation, the federal agents and PSP troopers applied for search warrants for the homes and businesses of various associates of Mr. D'Elia. On May 29, 2001, the federal magistrate judge for the United States District Court for the Middle District of Pennsylvania issued search warrants that authorized, *inter alia,* the searches of the home of Appellee Joseph and Appellee Acumark.[1] The search warrants were issued based on the affidavits of probable cause stating that a criminal conspiracy existed among Mr. D'Elia and others. The search warrants issued against Appellees authorized the search and seizure of any documents or materials demonstrating violation of the federal racketeering and racketeer influenced corrupt organization (RICO) statutes, records relating to an illegal sports bookmaking operation, and records relating to the secreting of assets.[2]

¶ 3 On May 31, 2001, federal agents and PSP troopers conducted searches of several businesses and individuals' homes pursuant to the search warrants, including the home of Appellee Joseph and the office of Appellee Acumark. At approximately 8:00 a.m., twenty to thirty armed IRS agents and PSP troopers entered Appellee Joseph's home in suburban Wilkes–Barre. The search lasted until approximately 3:00 p.m., and the seizure consisted of business and bank records of Appellee Joseph's businesses including Appellee Acumark.

¶ 4 Also on the morning of May 31st, approximately thirty armed federal agents executed the search warrant of Appellee Acumark's office in Wilkes–Barre. The agents seized Appellee Acumark's business records and records that involved Appellee Joseph's other business ventures.

¶ 5 The IRS agents and PSP troopers also executed search warrants at the homes of Mr. D'Elia and Jean Stanton and the home and office of Mr. Samuel Marranca. In addition, a search warrant was issued for the office of Raymond Zavada, who served as Appellee Joseph's personal and business accountant. The agents seized all of Mr. Zavada's files that related to Appellee Joseph and his business ventures.

*The Newspaper Articles*

¶ 6 As a result of the execution of the search warrants on May 31st, the local news media began reporting news stories on June 1, 2001. The *Citizens' Voice,* a local newspaper in the Wilkes–Barre— Scranton area owned by Appellant The Scranton Times LP, published ten news stories from June 1, 2001, through October 10, 2001, that involved Appellee Joseph or Appellee Acumark.[3] Appellant Lewis, a *Citizens' Voice* staff writer, wrote or co-

---

1. Appellee Joseph was the sole shareholder of Appellee Acumark.

2. Specifically, the warrant permitted the search for evidence of interstate transportation in aid of racketeering enterprises (18 U.S.C. § 1952), illegal gambling (18 U.S.C. § 1955), money laundering (18 U.S.C. § 1956 & § 1957), and RICO (18 U.S.C. § 1962).

3. The *Times–Leader,* another local newspaper in the Wilkes–Barre—Scranton area published six stories on the criminal investigation from June 2nd through June 8th. Appellees did not initiate a law suit against the *Times– Leader.*

wrote the final eight articles. A brief summary of the articles follows.

¶ 7 On June 1, 2001, the *Citizens' Voice* published an article headlined "Feds Raid Business in Pittston."[4] The article reported that approximately thirty federal and state agents executed a federal search warrant at the office of Appellee Acumark. *Citizens' Voice*, 6/1/2001, at ¶¶ 1–3. The article did not mention Appellee Joseph.

¶ 8 On June 2, 2001, the *Citizens' Voice* published an article headlined "Home of Acumark Owner Searched by Federal Agents."[5] This article reported that federal agents searched Appellee Joseph's home. *Citizens' Voice*, 6/2/2001, at ¶ 1. The article also reported that Michael Mey, Esquire, Appellee Joseph's attorney, confirmed that records were removed from Appellee Acumark's office. *Id.* at ¶ 4. The article included Attorney Mey's statement that Appellee Joseph did not know of any reason why a search warrant was served nor of any type of illegal activity at his home or business. *Id.* at ¶ 3. Attorney Mey concluded by stating that he made requests to the IRS and Department of Treasury for information regarding the searches. *Id.* at ¶ 5.

¶ 9 On June 5, 2001, the *Citizens' Voice* published an article headlined "Alleged Money-laundering Scheme Linked to Pittston Raid."[6] The article reported that a source informed that "a money-laundering ring might have been the reason behind the federal search warrants issued last week." *Citizens' Voice*, 6/5/2001, at ¶ 1. The article continued that "the 'three main players' whose residences were searched ... allegedly were laundering money through Acumark ... and a limousine/taxi

service." The article also reported that an unknown amount of money had been allegedly laundered in the 1990s through *The Metro*, a then-defunct newspaper, by buying fake advertisement space, and continued through Appellee Acumark after the sale of *The Metro*. *Id.* at ¶ 2. The article reported that the search warrants were executed following months of video surveillance and a federal grand jury investigation. *Id.* at ¶ 4. The article repeated that the federal agents searched the homes of Mr. D'Elia, Appellee Joseph, Ms. Stanton, and Mr. Marranca and the office of Appellee Acumark. *Id.* at ¶¶ 5–8, 11. The article also repeated that Attorney Mey confirmed that business records were removed from Appellee Acumark's office but was unsure if records were removed from Appellee Joseph's home. *Id.* at ¶ 9. The article also mentioned that records seized from an office at 1303 Wyoming Avenue, Exeter, involved *The Metro*. Appellants published a picture of Appellee Joseph with the article.

¶ 10 On August 5, 2001, the *Citizens' Voice* published an article headlined "Former Avoca Bar Target of Federal Money Laundering Probe."[7] The article centered on an investigation into alleged prostitution and drug trafficking of Al Carpinet, Jr., at Lavelle's Pub. *Citizens' Voice*, 8/5/2001, at ¶¶ 1–13. The article concluded with a recitation of the earlier articles involving the grand jury investigation of Appellee Joseph. *Id.* at ¶ 16. The *Citizens' Voice* described the investigation as ongoing and stated that it had learned that federal authorities were focusing on a limousine and taxi service based at the Wilkes–Barre–Scranton and Lehigh Valley

---

4. James Conmy, as a Times–Shamrock news writer, authored this article.

5. This article did not contain a by-line.

6. James Conmy, as a *Citizens' Voice* staff writer, and Edward Lewis wrote this article.

7. Edward Lewis and James Conmy, as *Citizens' Voice* staff writers, wrote this article.

international airports as a means to transport money, drugs, prostitutes, and guns from Atlantic City, Philadelphia, and New York City. *Id.* at 2.

¶ 11 Also, on August 5, 2001, the *Citizens' Voice* published an article headlined "Firearms Dealer Denies Involvement in Alleged Money Laundering Scheme."[8] The article centered on Gus Salazar, a Wyoming County firearms dealer, and stated that the PSP and Bureau of Alcohol, Tobacco, and Firearms, seized his firearms inventory. *Citizens' Voice,* 8/5/2001, at ¶ 1. The article included Salazar's denial that he was involved with Appellee Joseph or the money laundering. *Id.* at ¶ 2. The article reported that Attorney Mey represented Salazar and Appellee Joseph. *Id.* at ¶ 3. The *Citizens' Voice* indicated that a "source said both Salazar and Joseph have an interest in the collection of firearms linking the two together to the federal investigation." *Id.* at ¶ 3. The article included Attorney Mey's response that Appellee Joseph and Salazar were only connected by their retention of him for legal services. *Id.* at ¶ 4.

¶ 12 On August 6, 2001, the *Citizens' Voice* published an article headlined "Probe Investigating Pub Clientele."[9] The article reported the investigation into the alleged illegal activity of the patrons of Lavelle's Pub. *Citizens' Voice,* 8/6/2001, at ¶¶ 1–7. The article also reported that a federal grand jury began receiving testimony about alleged money laundering at the beginning of the year and that the investigation widened to include prostitution, gun running, and drug trafficking. *Id.* at ¶ 8. The article included a comment from a source who explained that IRS involvement began two years prior when the IRS received information that as much as $3 million had been laundered through *The Metro,* a newspaper formerly owned by Appellee Joseph. *Id.* at ¶ 11. The article also reported that several reliable sources stated that limousine services at two airports were being investigated for possibly transporting money, drugs, and firearms in attaché cases in trunks of the vehicles owned by the limousine services. *Id.* at ¶ 13. The article continued that according to public records, Appellee Joseph and his son, Thomas J. Joseph, owned and operated limousine and taxi services at the airports. *Id.* at ¶ 14.

¶ 13 On August 8, 2001, the *Citizens' Voice* published an article headlined "Ex-Metro Owner: I Didn't See Joseph Do Anything Wrong."[10] The article included an interview that the *Citizens' Voice* conducted with Bob Butts, a former employee of Appellee Joseph at *The Metro* who later purchased the paper from Appellee Joseph. *Citizens' Voice,* 8/8/2001, at ¶¶ 2–3. The article included Mr. Butts' praise of Appellee Joseph and another former *Metro* employee's comment that he had knowledge of *The Metro's* subscriptions and revenues and was not aware that Appellee Joseph did anything wrong. *Id.* at ¶¶ 14–16. The article included the previous report of the May 31st searches and that Appellee Joseph, Mr. D'Elia, and Mr. Marranca were at the center of a federal grand jury investigation into money laundering. *Id.* at ¶¶ 4–6. The article also included that Mr. D'Elia was a reputed mob boss of northeastern Pennsylvania. *Id.* at ¶ 7. The article also stated that a source indicated that Mr. Marranca leased the office at 1303 Wyoming Avenue, Exeter. *Id.* at ¶ 5.

8. Edward Lewis wrote this article.

9. Edward Lewis and James Conmy, as *Citizens' Voice* staff writers, wrote this article.

10. Edward Lewis authored this article.

¶ 14 On August 12, 2001, the *Citizens' Voice* published an article headlined "Report: Judge Barrasse Linked to IRS Investigation."[11] The article reported an allegation of a connection between Judge Barrasse and the investigation into the clientele at Lavelle's Pub. *Citizens' Voice*, 8/12/2001, at 1.¶ The article indicated that the same grand jury that was investigating drug activity of the patrons at Lavelle's Pub was investigating money laundering allegations. *Id.* at ¶ 1. The article continued with an accounting of the drug trafficking at Lavelle's Pub, which was shut down in 1997 following an investigation into drug trafficking that, in turn, led to the arrest of twenty people in 1998, and the investigation of the laundering of the drug proceeds. *Id.* at ¶¶ 2–15. The article concluded with a summation of its earlier reports on the May 31st searches of Appellee Acumark's office and of the homes of Appellee Joseph, Ms. Stanton, Mr. D'Elia, and Mr. Marranca, including the fact that agents seized records pertaining to *The Metro* from the office at 1303 Wyoming Avenue in Exeter. *Id.* at ¶¶ 16–18.

¶ 15 On August, 20, 2001, the *Citizens' Voice* published an article headlined "Federal Probe Expanding to Examine Political Corruption."[12] The article reported the allegations of illegal activity at Lavelle's Pub and on the part of Al Carpinet. *Citizens' Voice*, 8/20/2001, at ¶¶ 1–16. The article also mentioned the May 31st searches of Appellee Acumark's office and that a federal grand jury had been receiving testimony regarding alleged money laundering through *The Metro* and Appellee Acumark. *Id.* at ¶ 17.

¶ 16 On October 10, 2001, the *Citizens' Voice* published an article headlined "3 Witnesses Subpoenaed in Money-laundering Investigation."[13] The article began with a statement that a federal grand jury had subpoenaed three additional witnesses and that eight people had been arrested as the result of a state grand jury investigation into the allegedly illegal activities at Lavelle's Pub. *Citizens' Voice*, 10/10/2001, at ¶¶ 2–3. The article recapped its previous reports involving the May 31st searches of and investigation into the alleged money laundering operation through *The Metro* and Appellee Acumark and noted that government agents found *Metro* records during the search of the office leased to Mr. Marranca at 1303 Wyoming Avenue, Exeter. *Id.* at ¶¶ 8–13. The article also reported that a source indicated that the money allegedly laundered through *The Metro* "came from overfill and the selling of open airspace at several Pennsylvania landfills." *Id.* at ¶ 14. The article stated a source said, "This investigation took off since May 31," which was the date of the searches of Appellees. *Id.* at ¶ 15.

## PROCEDURAL HISTORY

¶ 17 On May 22, 2002, Appellees commenced a defamation action against Appellants pursuant to 42 Pa.C.S.A. §§ 8341–8345 (Uniform Single Publication Act). The complaint asserted various claims for defamation-libel and invasion of privacy based upon ten articles published in the *Citizens'* Voice.[14]

---

11. Edward Lewis wrote this article.

12. Edward Lewis wrote this article.

13. Edward Lewis wrote this article.

14. The plaintiffs originally included Thomas J. Joseph, Airport Limousine and Taxi Service, Inc., and Airport Taxi, Limousine and Courier Service of Lehigh Valley, Inc. Prior to trial, Acumark, Airport Limousine and Taxi Service, Inc., and Airport Taxi, Limousine and Courier Service of Lehigh Valley, Inc. withdrew their invasion of privacy claims.

¶ 18 Following the conclusion of discovery, Appellants filed a motion for summary judgment. On January 5, 2004, the trial court denied the summary judgment motion. An eight-day non-jury trial commenced on May 16, 2006, and concluded on May 26, 2006. At the close of Appellees' case-in-chief, Appellants made a motion for directed verdict. The trial court granted the motion as to all claims made by Thomas J. Joseph. At the conclusion of Appellants' defense, Appellants renewed the motion for directed verdict. The trial court denied the motion. On October 27, 2006, the trial court entered its verdict in favor of Appellees on the defamation action against Appellants.[15] The trial court concluded that eight of the articles [16] (collectively Defamatory Articles) defamed Appellees by either directly or implicitly indicating that Appellees were engaged in a broad range of criminal enterprises uncovered by an investigation when in fact the investigation targeted other individuals and businesses. In arriving at this conclusion, the trial court found that Appellees were private figures, that Appellees proved that the Defamatory Articles were false, and that Appellees proved that Appellants published the Defamatory Articles with want of reasonable care and diligence to ascertain the truth. The trial court awarded to Appellee Joseph compensatory damages in the amount of $2 million and to Appellee Acumark compensatory damages in the amount of $1.5 million.

¶ 19 Following entry of the verdict, Appellants filed a motion for post-trial relief seeking judgment *non obstante verdicto* (JNOV) or a new trial. On November 8, 2006, the trial court denied the motion for post-trial relief. The Prothonotary entered judgment on the verdict on November 16, 2006. This timely appeal followed. The trial court ordered Appellants to file a Pa.R.A.P.1925(b) statement; they complied. The trial court then authored a comprehensive Pa.R.A.P.1925(a) opinion.

## ISSUES ON APPEAL

¶ 20 On appeal, Appellants present the following questions for our review:

I. Whether judgment in favor of [Appellants] was required where [Appellees] did not meet their constitutionally-mandated burden to prove that the allegedly libelous statement was false?

II. Whether [Appellees], who engaged in voluntary actions that drew them into a public controversy, were limited purpose public figures and thus required to prove actual malice on the part of the defendants?

III. Whether judgment in favor of [Appellants] was required where [Appellees] did not prove actual malice—*i.e.*, that [Appellants] either knew that the allegedly libelous statements were false or published them with a reckless disregard of whether they were true or false?

IV. Whether judgment in favor of [Appellants] was required where [Appellees] did not prove negligence—*i.e.*, that [Appellants] either knew that the allegedly libelous statements were false or pub-

The defendants originally included Edward J. Lynett, Jr., George V. Lynett, Cecelia Lynett Haggerty, The Scranton Times, Inc., Shamrock Communications, Inc., ZYXW, Inc., and James Conmy. Prior to trial, the parties stipulated to the dismissal of all claims against these defendants.

**15.** The trial court also entered a verdict in favor of the defendants as to Appellee Thomas

A. Joseph's invasion of privacy claim, as to all plaintiffs' claims for punitive damages, and as to the defamation claims of Airport Limousine and Taxi Service, Inc., and Airport Taxi, Limousine and Courier Service of Lehigh Valley, Inc.

**16.** The trial court found the last eight articles, chronologically, were defamatory.

lished them with a reckless disregard of whether they were true or false?

V. Whether judgment in favor of [Appellants] was required where [Appellees] did not prove that they suffered an injury caused by the allegedly libelous statement?

Appellants' brief, at 2.

## DISCUSSION

### Standard and scope of review

¶ 21 Because Appellants filed this appeal from the judgment entered following a non-jury trial, the following general principles apply to our review:

> Our review in a non-jury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Fletcher–Harlee Corp. v. Szymanski*, 936 A.2d 87, 92–93 (Pa.Super.2007) (*quoting Hollock v. Erie Insurance Exchange*, 842 A.2d 409, 413–14 (Pa.Super.2004) (quotation marks and citations omitted)). Further, because Appellants sought but were denied JNOV or a new trial, the following

principles of appellate review also are implicated:

> In reviewing a motion for [JNOV], the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Moreover, a [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations.
>
> There are two bases upon which a [JNOV] can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Fletcher–Harlee Corp.*, 936 A.2d at 93 (*quoting Moure v. Raeuchle*, 529 Pa. 394, 402–03, 604 A.2d 1003, 1007 (1992) (citations and quotation marks omitted)).

> Similarly, when reviewing the denial of a motion for new trial, we must determine if the trial court committed an abuse of discretion or error of law that controlled the outcome of the case.

*Fletcher–Harlee Corp.*, 936 A.2d at 93 (*quoting Long et al. v. Mejia et al.*, 896

A.2d 596, 599 (Pa.Super.2006) (citations omitted)).

¶ 22 Appellants preserved their right to seek a JNOV by making an oral motion for directed verdict at the close of all the evidence presented. N.T. Trial 5/16/2006–5/19/2007 vol. 2, at 1246 [17]; *see also* Pa. R.C.P. 227.1(b)(1); *Hayes v. Donohue Designer Kitchen, Inc.*, 818 A.2d 1287, 1291 n. 4 (Pa.Super.2003) ("[C]ases indicate that in order to preserve the right to request a JNOV post-trial[,] a litigant must first request a binding charge to the jury or move for directed verdict at trial.").

*Falsity of purported libelous statement*

¶ 23 Keeping these scopes and standards of review in mind, we turn our attention to the appeal in this defamation action.

■■■■■ ¶ 24 Defamation, of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements. *Zartman v. Lehigh County Humane Society*, 333 Pa.Super. 245, 482 A.2d 266, 268 (1984). A publication is defamatory if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession. *See MacElree v. Philadelphia Newspapers, Inc.*, 544 Pa. 117, 124–25, 674 A.2d 1050, 1054 (1996). In order to be actionable, the words must be untrue, unjustifiable, and injurious to the reputation of another. *See* 42 Pa.C.S.A. § 8343(a). When communications tend to lower a person in the estimation of the community, deter third persons from associating with him, or adversely affect his fitness for the proper conduct of his lawful business or profession, they are deemed defamatory. *Green v. Mizner*, 692 A.2d 169, 172 (Pa.Super.1997). A "libel" is any malicious publication that is written, printed, or painted, or procured to be written, printed, or painted, and which tends to expose a person to contempt, ridicule, hatred, or degradation of character. *See Schnabel v. Meredith*, 378 Pa. 609, 107 A.2d 860, 862 (1954); *see also Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899, 904 (1971). The court must view the allegedly defamatory statements in context. *Baker v. Lafayette College*, 516 Pa. 291, 532 A.2d 399, 402 (1987).

> Words which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, we must consider the full context of the article to determine the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

*Thomas Merton Center v. Rockwell International Corp.*, 497 Pa. 460, 465, 442 A.2d 213, 216 (1981) (citations and quotation marks omitted).

■■■ ¶ 25 The right of protecting one's reputation can be found in our state Constitution: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those enjoying and defending life and

---

**17.** Appellants' counsel entitled their oral motion at the close of Appellees' case-in-chief as "directed verdict;" however, a directed verdict, by definition is moved for at the close of all the evidence. Pa.R.C.P. 226(b). At the close of all the evidence, Appellants' counsel asked to renew their "compulsory nonsuit motions;" however, compulsory nonsuit, by definition, is used to test the sufficiency of evidence, generally at the close of the plaintiff's case-in-chief. Pa.R.C.P. 230.1. We elect not to find waiver because of Appellants' counsel's obvious mislabeling of the oral motion for a directed verdict at the close of all the evidence.

liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. Art. 1, § 1. Our legislature enacted legislation to protect a person's rights regarding defamation. The Uniform Single Publication Act, 42 Pa.C.S.A. §§ 8341–8345, sets forth the elements of a *prima facie* case in a defamation action. The burden is on the plaintiff to prove:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S.A. § 8343(a). In turn, when a *prima facie* case of defamation is properly raised, the defendant has the burden of proving:

(1) The truth of the defamatory communication.

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comment as of public concern.

*Id.* at § 8343(b). Case law prescribes additional elements that arise in relation to the role of the defendant specifically, in this instance, is the question of whether the defendant is a member of the media. "If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false." *Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 191 (Pa.Super.2003) (*citing Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)). This leads us to Appellants' first issue on appeal—whether the trial court erred in failing to enter judgment in Appellants' favor because Appellees failed to prove that the Defamatory Articles were false.

¶ 26 Appellants argue that, as the investigation into criminal activity involved a matter of public concern, Appellees were required to prove that the government was not conducting the criminal investigation mentioned in the Defamatory Articles. Appellants allege that Appellees failed to meet this burden because Appellees did not call a witness or produce a document proving that Appellants' description of the government's investigation was false. Further, Appellants contend that Appellee Joseph conceded that he could not prove falsity of the Defamatory Articles because he was not privy to the government's investigation. Appellants argue that the trial court's conclusion that Appellees met their burden was erroneous because the trial court equated the language in the Defamatory Articles that "Appellees were under investigation" with "Appellees had, in fact, committed crimes" because the trial court imposed upon Appellants the burden of proving that the statements were true.

¶ 27 Appellees bore the burden of proving, by a preponderance of the evidence, that the Defamatory Articles were, in fact, false. *Hepps*, 475 U.S. at 777, 106 S.Ct. 1558; *Agriss v. Roadway Express, Inc.*, 334 Pa.Super. 295, 483 A.2d 456, 461 (1984) (preponderance of evidence is standard for proving falsity).

■ ¶ 28 The trial court found that evidence adduced at trial demonstrated

that the statements concerning the criminal activities of Appellees as Appellants reported were false and not supported by credible, admissible evidence. We agree.

¶ 29 In reviewing the application and affidavits for the search warrants of Appellee Joseph's home, Appellee Acumark's office, and Mr. Marranca's home, we found there was no mention that Appellees were the subject of video surveillance as implied in Appellants' October 10, 2001 article. *See* Application and Affidavit for Search Warrant of Offices of Acumark (Defendants' trial exhibit 12); Application and Affidavit for Search Warrant of Joseph Residence (Defendants' trial exhibit 14); Application and Affidavit for Search Warrant of Marranca Residence (Defendants' trial exhibit 15); Application and Affidavit for Search Warrant of D'Elia Residence (Defendants' exhibit 29). The applications and affidavits also failed to mention the drug trafficking enterprise operated from Lavelle's Pub. However, in the Defamatory Articles regarding a drug ring at Lavelle's Pub, Appellants included Appellee Joseph's and Appellee Acumark's names and a fair reading of the Defamatory Articles would imply that Appellees were involved in the criminal conduct at the bar. However, the May 31st searches of Appellees did not establish a link between Appellee Joseph or Appellee Acumark and Lavelle's Pub nor did the federal investigation into Lavelle's Pub.

¶ 30 In the final nine published articles, Appellants claimed that a federal grand jury investigation centered on Appellee Joseph. However, the indictment that resulted from the May 31st search warrant failed to reference Appellee Joseph, Appellee Acumark, or any of Appellee Joseph's businesses. *United States v. D'Elia and Smallacombe,* CR. NO. 06–191

(M.D.Pa.5/24/2006) (Defendants' trial exhibit 335). Further, the indictment did not reference any allegations of money laundering through a business owned by Appellee Joseph or any allegations of drug trafficking, gun running, or prostitution through the limousine services owned by Appellee Joseph. *Id.* The indictment failed to reference any video surveillance of Appellee Joseph, Appellee Acumark, or any business owned by Appellee Joseph. *Id.* The trial court found credible Appellee Joseph's statement that he did not receive a target letter from the government investigators. N.T. Trial, 5/16/2006–5/19/2006 vol. 1, at 125.

¶ 31 Also the judgment of sentence against Mr. Marranca did not involve any criminal activity between Mr. Marranca and Appellees. As a result of the May 31st search of Mr. Marranca's home, the government obtained a conviction for violation of 18 U.S.C. § 922(g)-Felon in Possession of Firearms. *United States v. Marranca,* No. 3:02–CR–263–01, 2003 WL 25700091 (M.D.Pa.2003) (Defendants' trial exhibit 24), *aff'd,* 98 Fed.Appx. 179 (3rd Cir.2004). The court also convicted Mr. Marranca of conspiracy to commit money laundering from an offense that concluded on December 31, 2000.[18] *Id.*

¶ 32 Appellants also published that the government conducted searches of Mr. Marranca's office. Appellants identified Mr. Marranca as having strong ties to organized crime; Appellants mentioned Appellee Joseph with Mr. Marranca in six of the articles. In four articles, Appellants linked Appellee Joseph and his business *The Metro* to allegations of money laundering from records seized at Mr. Marranca's office. However, at trial, Appellee Joseph produced evidence that the search

---

**18.** The criminal conspiracy to commit money laundering conviction stemmed from illegal gambling activity. *United States v. Marranca,* 98 Fed.Appx. 179 (3rd Cir.2004).

warrant inventory of Mr. Marranca's office did not include records of *The Metro*. (Plaintiffs' ex. 26). Search warrant for Samuel Marranca's office with inventory sheets. Further, the trial court found credible the testimony of Appellee Joseph and former employees of *The Metro,* including the accountant, stating that money laundering did not occur at *The Metro* or at Appellee Acumark. Similarly, the trial court found credible the testimony of Appellee Joseph, employees of Appellee Joseph's airport limousine and taxi services, the business manager of the Wilkes–Barre—Scranton Airport, and the Pittston borough police chief that Appellee Joseph did not use his airport limousine and taxis services to transport money, drugs, guns, or prostitutes.

¶ 33 The trial court also compared and contrasted the Defamatory Articles with the articles published in the *Times Leader*. The trial court noted that the *Times Leader's* articles *did not contain* the following statements that appeared in the *Citizens' Voice:* (1) Appellee Joseph or Appellee Acumark received a target letter from the government investigators; (2) Appellee Joseph's limousine and taxi services were used to transport money, drugs, guns, and prostitutes; (3) Appellee Joseph was allegedly linked to an alleged pimp and to the drug ring at the local bar; (4) Appellee Joseph and Appellee Acumark were involved in political corruption; (5) Appellee Joseph laundered $3 million through *The Metro;* (6) federal investigators found records of *The Metro* in Mr. Marranca's office; (7) Appellee Acumark was involved in money laundering; and (8) government investigators conducted video surveillance of Appellee Joseph. Trial court opinion, 3/28/2007, at 27–28.

¶ 34 Upon review of the ten articles alleged to be defamatory, the trial court concluded that Appellants published false statements insofar as the Defamatory Articles expressly, or conveyed by reasonable implication to the average reader, that (1) Appellee Joseph was a "main" player in a money laundering ring; (2) *The Metro* laundered $3 million while Appellee Joseph owned it; (3) the government found records of *The Metro,* which had implicitly linked Appellee Joseph to money laundering, in the offices of Mr. Marranca; (4) Appellee Acumark laundered money and participated in the money laundering ring; (5) Appellee Joseph used his airport limousine services to transport drugs, prostitutes, guns, and money to other cities on the East Coast; (6) the government sent Joseph a target letter as a result of the grand jury investigation; (7) the government video taped Appellee Joseph engaging in illegal activity; (8) Appellee Joseph and Appellee Acumark were involved with an alleged pimp and an alleged drug trafficker; (9) Appellee Joseph was involved in illegal activity with a local gun dealer who the Bureau of Alcohol, Tobacco, and Firearms was investigating; and (10) the government linked Appellee Joseph to a probe of political corruption. Trial court opinion, 3/28/2007, at 28.

¶ 35 The trial court indicated that Appellants did not provide evidence as to the veracity of the Defamatory Articles. The trial court noted that while Appellee Joseph and Appellee Acumark, as plaintiffs, had the burden of proving falsity, Appellants essentially challenged Appellee Joseph and Appellee Acumark to prove the negative of the published statements; this placed Appellee Joseph and Appellee Acumark in an unattainable position. Trial court opinion, 3/28/2007, at 29. The trial court did not specifically use the lack of proof by Appellants in its determination of whether Appellee Joseph and Appellee Acumark met their burden of proving falsity, but it did not ignore Appellants' failure to present credible evidence tending to

establish truth.[19] *Id.* at 29. Further, the trial court found the indictment's failure to mention Appellee Joseph or Appellee Acumark in allegations of criminal activity revealed the false nature of Appellants' published statements. *Id.* at 29.

¶ 36 We concur with the trial court's conclusion that Appellee Joseph and Appellee Acumark met their burden in proving that eight of the published articles contained false statements; accordingly, Appellants first issue fails.

*Limited purpose public figure*

■■■■■ ¶ 37 Case law also prescribes an additional element in relation to the role of the plaintiff, specifically, in this instance, is whether the plaintiff is a limited public figure.

> Case law further informs us that if the plaintiff is a public figure he or she must prove that the defendant published the offending statement with "actual malice," *i.e.,* with knowledge that the statement was false or with reckless disregard of its falsity. *Curran v. Philadelphia Newspapers, Inc.,* 497 Pa. 163, 439 A.2d 652, 659 (1981) (*quoting New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Actual malice is not judged on an objective reasonable man standard. Rather, for the purposes of establishing that a defendant acted with reckless disregard for the truth, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Norton v. Glenn,* 580 Pa. 212, 860 A.2d 48, 55 (2004) (*citing St. Amant v. Thompson,*

390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). However, it is important to note that immunity from defamation liability is not guaranteed merely because a defendant protests that he published in good faith. *Id.* Actual malice can be shown when "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation," or "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* (*citing St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323).

*Weaver v. Lancaster Newspapers, Inc.,* 592 Pa. 458, 467, 926 A.2d 899, 903 (2007).

¶ 38 This leads us to Appellants' second and third issues on appeal whether the trial court erred in failing to find Appellees to be limited public figures by the nature of their actions and, thus, failing to require Appellees to demonstrate that Appellants acted with actual malice.

■■■■■ ¶ 39 In *New York Times v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the United States Supreme Court mandated that public officials and public figures must prove "actual malice" in order to recover damages in a defamation action against the media, that is, "that the defamatory statements were made with knowledge of their falsity or with reckless disregard of the truth." *Avins v. White,* 627 F.2d 637, 646 (3d Cir.1980), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980). Subsequently, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789

---

19. We recognize that there is a balance between the defendant-media's need to protect the confidentiality of its source and the defendant-media's burden of proving the veracity of the allegedly defamatory statement pursuant to 42 Pa.C.S.A. 8343(b)(1), which could limit the defendant-media's ability to prove veracity. However, as noted, the trial court did not specifically rely on Appellants' lack of proof in determining whether Appellees met their burden.

(1974), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983), the Court identified two classes of public figures:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Id.,* 418 U.S. at 351, 94 S.Ct. 2997. A person may become a limited purpose public figure if he "thrust[s] himself into the vortex of the discussion of pressing public concerns." *Rosenblatt v. Baer,* 383 U.S. 75, 86 n. 12, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Such a person uses "purposeful activity" to thrust "his personality" into a "public controversy." *Curtis Publishing Co.* 388 U.S. at 155, 87 S.Ct. 1975. He becomes a limited purpose public figure because he invites and merits "attention and comment." *Gertz,* 418 U.S. at 346, 94 S.Ct. 2997. A person may become a limited purpose public figure if he attempts to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants. *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1292 (D.C.Cir.1980), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). "A private individual," however, "is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston v.*

*Reader's Digest Assoc.,* 443 U.S. 157, 167, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).

¶ 40 It is the function of the court to ascertain in the first instance whether the plaintiff is a public or private figure. *Smith v. A Pocono Country Place Property Owners Assoc., Inc.,* 686 F.Supp. 1053, 1056 (M.D.Pa.1987). "The classification of a plaintiff as a public or private figure is a question of law to be determined initially by the trial court and then carefully scrutinized by an appellate court." *Id.,* 686 F.Supp. at 1056 (*quoting Marcone v. Penthouse Int'l Magazine,* 754 F.2d 1072, 1081 n. 4. (3d Cir.1985)); *see also Wolston,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450.

¶ 41 Appellants argue that Appellee Joseph and Appellee Acumark became limited purpose public figures when Appellants published the articles. Appellants further contend that Appellee Joseph's voluntary association with a reputed crime figure, the government's high profile searches, and the widespread publicity generated from the government's investigation, demonstrated that Appellee Joseph and Appellee Acumark were key figures in a public controversy and, thus, were limited purpose public figures.

¶ 42 The trial court found that Appellees did not inject themselves into an issue of public interest, concern, or controversy so as to become limited purpose public figures. Trial court opinion, 3/28/2007, at 8. We agree.

¶ 43 In order to classify Appellees as limited purpose public figures, Appellants must prove that Appellees "voluntarily thrust themselves into the vortex of the public controversy." [20] *Marcone,* 754 F.2d

---

20. As the United States "Supreme Court has not provided a detailed chart on the contours of the public and private figure categories," the federal appellate courts have fashioned their own tests. *Marcone,* 754 F.2d at 1082; *compare Wells v. Liddy,* 186 F.3d 505, 534

at 1083. From this voluntary act, we derive the notion that the person assumed the risk and there is consequent fairness in labeling the person a public figure. *Id.,* 754 F.2d at 1083.

¶ 44 First, Appellants needed to prove that Appellees were involved in a public controversy. *Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783.

 ¶ 45 Mere newsworthiness alone does not create a public controversy. *Marcone,* 754 F.2d at 1083.

> A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. The United States Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention.

> To determine whether a controversy indeed existed ... the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.... If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy. (citations omitted)

*Iafrate v. Hadesty,* 423 Pa.Super. 619, 621 A.2d 1005, 1007–08 (1993) (*quoting Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296–1297 (D.C.Cir.1980)).

¶ 46 The criminal investigations that were the basis of the *Citizens' Voice* articles clearly fell within the ambit of public interest. *See, e.g., Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (plaintiff's possible connection to organized crime and use of connection to influence government are matters of public interest); *see also, Marcone,* 754 F.2d at 1083 (allegations of drug trafficking are matters of public interest).

¶ 47 Now, we turn to the questions of whether Appellees retained a greater ability to rebut the defamatory comments because of their status and whether Appellees voluntarily assumed a role of special prominence. *American Future Systems v. Better Business Bureau,* 592 Pa. 66, 86, 923 A.2d 389, 401 (2007) (*citing Gertz,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789). In order to make this determination, we find it necessary to examine the nature and extent of Appellees involvement in the public controversy.

¶ 48 Mr. D'Elia was a reputed leader of *La Cosa Nostra,* specifically the Bufalino Crime Family in northeastern Pennsylvania. Appellee Joseph was aware of Mr. D'Elia's involvement with organized crime. *See, e.g.,* N.T. Trial, 5/16/2006–5/19/2006 vol. 1, at 209. Appellee Joseph and Mr. D'Elia had a personal, social relationship that began in the 1970s. *Id.* at 107–08. This relationship included their respective families. *Id.* at 108–09. From this social relationship, Appellee Joseph and Mr. D'Elia developed a business relationship. Appellee Joseph testified that while Mr. D'Elia did not have any involvement with *The Metro,* Mr. D'Elia did refer persons to

---

(4th Cir.1999) (establishing five-part test: (1) plaintiff had access to effective channels of communication, (2) plaintiff voluntarily assumed a role of special prominence, (3) plaintiff sought to influence the resolution or outcome of the controversy, (4) the controversy existed prior to the publication of the alleged defamation, and (5) plaintiff retained public figure status at the time of the alleged defamation). As the Pennsylvania Supreme Court has not established a definitive test, we will employ the test used in the Third Circuit.

*The Metro. Id.* at 109–10. Further, Appellee Joseph stated that he paid Mr. D'Elia commission on any printing business that came from him. *Id.* at 110. Appellee Joseph testified that in the mid 1990s, he began to distance himself from Mr. D'Elia socially because of Mr. D'Elia's association with Mr. Marranca. *Id.* at 215–16. By 2001, Appellee Joseph and Mr. D'Elia, while still friends, only spoke on the telephone several times a year. *Id.* at 111. In May of 2001, the government executed the search warrant on Appellees based on Appellee Joseph's association with Mr. D'Elia.

¶ 49 Traditionally, a plaintiff could only be considered a limited purpose public figure relative to a pre-existing controversy in which he elected to participate. *See Rutt v. Bethlehems' Globe Publ'g Co.,* 335 Pa.Super. 163, 484 A.2d 72, 83 (1984); *cf. Hutchinson v. Proxmire,* 443 U.S. 111, 134–35, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (noting that defamation plaintiff does not become public figure simply because media gives opportunity to respond). In more recent times, the typical limited purpose public figure case involves a plaintiff actively participating in the public controversy in a manner intended to obtain attention. *Am. Future Sys.,* 592 Pa. 66, 87, 923 A.2d 389, 402; *see also Woy v. Turner,* 573 F.Supp. 35 (N.D.Ga.1983) (holding news conference to attract media attention to self and to client).

¶ 50 Appellants contend that Appellees actively participated in the public controversy when their attorney made comments on their behalf to the media. The trial court found, and we agree, that while Appellees had access to effective means of communication as evidenced by Appellees' attorney's ability to make statements to the press, Appellees' attorney's statements were limited and defensive to the allegations made in the *Citizens' Voice* articles.

The statements were not substantive comments on any matters in the articles. Further, Appellees did not have any greater access to the media than a private individual. Accordingly, Appellees did not make these statements to influence the resolution of the outcome of any perceived controversy and did not create limited purpose public figures of Appellees.

¶ 51 In other defamation cases, the plaintiff's action may itself invite comment and attention, and even though he does not directly try or even want to attract the public's attention, he is deemed to have assumed the risk of such attention. *Marcone,* 754 F.2d at 1083.

¶ 52 Appellants argue that Appellee Joseph's association with Mr. D'Elia drew him into the public controversy—namely, the criminal investigation that resulted in the issuance of search warrants and in the subsequent searches of Appellee Joseph's home and Appellee Acumark's office. Appellees did not dispute that Appellee Joseph and Mr. D'Elia had a business relationship and a personal friendship. Their relationship and friendship made Appellee Joseph a subject in the search warrants. The trial court found that Appellee Joseph's relationship with Mr. D'Elia did not rise to the level of him voluntarily assuming a role of special prominence. Trial court opinion, 3/28/2007, at 15. We agree.

¶ 53 In *Marcone,* an attorney sued *Penthouse* for defamation regarding an article that linked the attorney to drug trafficking and to outlaw motorcycle clubs. To determine if Marcone was a limited purpose public figure, the Third Circuit Court of Appeals examined whether he voluntarily placed himself into a public controversy and assumed the risk of being a public figure. The Court looked to (1) Marcone's indictment in the drug trafficking conspiracy and the attendant publicity; (2) his legal representation of motorcycle gang members; and (3) his non-representational

ties to the Pagans and Warlocks motorcycle clubs. The Court recognized that *Marcone* was a close case. "[I]f each element of the equation is taken separately it may be argued that no one aspect may be sufficient to create public figure status." *Marcone*, 754 F.2d at 1086. The Court concluded that given the public nature of the drug trafficking, the widespread media attention, and Marcone's significant contact with the Pagans that was of a non-legal representation type, Marcone crossed the line from private to limited purpose public figure. *Id.*, 754 F.2d at 1086–87.

¶ 54 We can distinguish *Marcone* from the present case. While both Appellees and Marcone continued a relationship, both business and personal, with individuals who were known criminals, Appellee Joseph testified that his relationship with Mr. D'Elia diminished in the time leading up to the public controversy while Marcone continued his personal involvement with the Pagans. Further, Appellee Joseph was never indicted while Marcone's relationship with the Pagans led to an indictment. If, as the Third Circuit recognized, *Marcone* was a close case, the present case is not nearly as close. We find that the trial court correctly determined that Appellants failed to prove that Appellee Joseph and Appellee Acumark were limited purpose public figures; accordingly, Appellants' second and third issues fail. *Negligent publication of defamatory material*

■■■■■ ¶ 55 As Appellees were found to be private figures, Appellees needed to prove that the defamatory material was published in a negligent manner in order to recover. *Am. Future Sys.*, at 84, 923 A.2d 389, 932 A.2d at 400. A negligent manner is publication with want of reasonable care and diligence to ascertain the truth. *Rutt*, 484 A.2d at 83. This leads us to Appellants' fourth issue on appeal— whether the trial court erred in finding that the Appellees proved that Appellants published the allegedly defamatory statements with a want of reasonable care and diligence to ascertain the truth.

¶ 56 To prove that Appellants published the defamatory statements negligently, Appellees presented the expert testimony of Christopher Harper, an associate professor tenured at the Department of Journalism in the School of Communications and Theater at Temple University. The trial court qualified Professor Harper as an expert in the field of journalism and journalistic policies.

¶ 57 Professor Harper testified about the inherent dangers in utilizing confidential sources. N.T. Trial, 5/16/2006– 5/19/2006 vol. 1, at 453. He indicated that confidential and anonymous sources should be used only in very extreme cases. *Id.* at 453. He reasoned that when a source is not named, there is no ability to question whether the source is stating fact or opinion or has a bias. *Id.* at 453. Professor Harper indicated that he reviewed the *Citizens' Voice* confidentiality guidelines in its own journalistic code.[21] *Id.* at 453–55. He

---

21. Regarding confidentiality and the use of unnamed sources, the *Citizens' Voice* journalistic code states the following guidelines:

1. While anonymous sources are a critical element of some important stories, frequent reliance on them in the newspaper increases the risk of inaccurate or unfair journalism and can adversely affect the newspaper's credibility with readers.

2. Anonymous statements and quotes should be published only when necessary to provide important information and only after the reporter and the editor in charge are satisfied that the *Citizens' Voice* is meeting its standards for accuracy and fairness.

3. Reporters should avoid making promises of confidentiality to sources when those promises are not in the newspaper's or the

then applied his knowledge of journalistic policies and the *Citizens' Voice's* journalistic code to Appellants' vetting process prior to the publication of alleged defamatory articles. Professor Harper noted that Appellants failed to follow its own journalistic code involving the editor's review of the confidential sources. *Id.* at 455. The editors of the articles requested information on the confidential source in only one of the articles and conducted one meeting with two reporters in which the sourcing was discussed. *Id.* at 456–57. Professor Harper then reviewed the eight defamatory articles individually and found problems with six of the articles published.[22] *Id.* at 460–83. He concluded that Appellants violated the journalistic code of the *Citizens' Voice* as well as generally accepted newsroom standards regarding the inspection of articles prior to publication, the use of confidential sources, and editorial oversight. N.T. Trial, 5/16/2006–5/19/2006 vol. 1, at 487–88.

¶ 58 Although the articles used unnamed sources potentially fourteen times, only Appellant Lewis had used his sources prior to these articles. Mr. Conmy testified that he believed that he was the only person talking to his unnamed sources. N.T. Trial, 5/16/2006–5/19/2006 vol. 1, at 761 (Conmy depo., at 102–04). Appellant Lewis granted confidentiality to his sources without prior editorial approval, which contravened the *Citizens' Voice's* journalistic code. *Id.* at 423 (Golias depo., at 40–41); *id.* at 757 (Lewis vol. I depo., at 248–50); *id.* at 761 (Conmy depo., at 102–04). Mr. Conmy testified that Editor Golias did not ask to meet with any of his sources. *Id.* at 761 (Conmy depo., at 109). Further, Appellants published the Defamatory Articles

in the *Citizens' Voice* when they did not possess any information, other than the unnamed source, that linked Appellees to organized crime, to Lavelle's Pub, or to illicit activity involving Appellee Joseph's airport limousine businesses. *See, e.g., id.* at 429 (O'Donnell's depo., at 109–110); *id.* at 757 (Lewis vol. II depo., at 47, 70–72).

¶ 59 The trial court found that Professor Harper's expert opinion supplemented the evidence presented at trial that Appellants did not properly vet the confidential sources, that editorial oversight was nonexistent, and that Appellants failed to conform to generally-accepted journalistic standards. Trial court opinion, 3/28/2007, at 22.

¶ 60 Appellants presented the federal indictment of Mr. D'Elia as evidence of the fact that the *Citizens' Voice* did not publish the articles negligently. However, we reviewed the federal indictment and found that the indictment did not mention Appellees and it did not mention the accusations in the articles. A federal grand jury indicted Mr. D'Elia of conspiring with Richard Smallacombe, John Doncses, and Frank Pavlico to commit money laundering and of conspiring with Richard Smallacombe, John Doncses, Frank Pavlico, III, and Lous Pagnotti, III, to commit obstruction of justice and perjury. *United States v. D'Elia and Smallacombe,* No. 06–CR–191 (Defendants' trial exhibit 335). However, the Defamatory Articles did not involve the persons or the accusations in the indictment. Accordingly, the trial court correctly concluded that the indictment of Mr. D'Elia did not attest to the veracity of the articles or the manner of publication.

reader's best interests, but reporters should be prepared to honor such promises.
Plaintiffs' trial exhibit 17.

**22.** Professor Harper also had a problem with not using the name of a neighbor and an Appellee Acumark employee in the first article. However, the trial court found that the article was not defamatory.

¶ 61 We conclude that the trial court correctly concluded that Appellants failed to follow their own journalistic code and that they published the Defamatory Articles in a negligent manner. Accordingly, Appellants' fourth issue fails.

*Suffered Loss*

¶ 62 Lastly, Appellants argue that the trial court erred in failing to enter judgment in their favor because Appellees failed to prove that they suffered an injury that was caused by the allegedly libelous statements.

■■■■ ¶ 63 Courts adjudicating libel cases as triers of fact should be guided by the same general rules regarding damages that govern other types of tort recovery. *Sprague v. Walter*, 441 Pa.Super. 1, 656 A.2d 890, 923 (1995). Sitting as the trier of fact, the trial court determines the question of damages. The plaintiff bears the burden of proving damages by a preponderance of the evidence; the amount of damages may be proven by the plaintiff furnishing a reasonable amount of information from which the trial court may fairly estimate the damages without engaging in speculation. *Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215, 1225–26 (1987).

■■■■ ¶ 64 As the defamatory articles published words imputing the commission of infamous crimes by Appellees, the words were actionable *per se*.[23] With words that are actionable *per se*, only general damages, *i.e.*, proof that one's reputation was actually affected by defamation or that one suffered personal humiliation, or both, must be proven; special damages, *i.e.*, out-of-pocket expenses borne by the plaintiff due to the defamation, need not be proven. *Brinich v. Jencka*, 757 A.2d 388,

397 (Pa.Super.2000). A plaintiff in a defamation action need not prove special damages or harm in order to recover; he may recover for any injury done to his reputation and for any other injury of which the libel is the legal cause. *Agriss*, 483 A.2d at 474. Pennsylvania has adopted the rule of Restatement (Second) of Torts, § 569 (1977), that all libels are actionable without proof of special harm. *Curran v. Philadelphia Newspapers, Inc.*, 376 Pa.Super. 508, 546 A.2d 639, 641 n. 3 (1988).

■■■■ ¶ 65 Compensatory damages recoverable for defamation include actual damages recoverable for the proven harm caused by the publication. *Walker v. Grand Cen. Sanitation, Inc.*, 430 Pa.Super. 236, 634 A.2d 237, 244 (1993). Actual damages include general damages and special damages. *Sprague v. Am. Bar Ass'n*, 276 F.Supp.2d 365, 368 (E.D.Pa.2003). Actual damages must be established through competent evidence concerning the injury. *Gertz*, 418 U.S. at 350, 94 S.Ct. 2997. Where damage of reputation is claimed, evidence concerning the circulation and contents of the defamatory publication may support an inference that it was read by its intended recipients and caused damage to the plaintiff's reputation. *Agriss*, 483 A.2d at 463. Additionally, the plaintiff in a defamation action may also present testimony concerning his loss of reputation. *Wilson v. Benjamin*, 332 Pa.Super. 211, 481 A.2d 328, 333 (1984).

■■■■ ¶ 66 The trial court awarded compensatory damages to Appellee Joseph in the amount of $2 million for humiliation and the substantial and irremediable mental and emotional harm as well as harm to his reputation caused by the Defamatory Articles. Trial court opinion, 3/28/2007, at 46.

---

**23.** Generally, defamatory words are either actionable *per se* or actionable *per quod*. Words that on their face and without the aid of extrinsic evidence are recognized as injurious are actionable *per se;* words that are actionable *per quod* are those that the injurious nature appears only in consequence of extrinsic facts.

¶ 67 Appellants contend that regarding injury to reputation, Appellees failed to present evidence of others in the community and relied solely on the testimony of Appellee Joseph and his family. However, as noted by this Court in *Wilson,* the plaintiff's testimony concerning damage to reputation and emotional harm was sufficient to prove compensable damages. *Wilson,* 481 A.2d at 333; *see also Marcone,* 754 F.2d at 1080. Accordingly, we find that Appellee Joseph proved harm to his reputation and that the trial court did not commit error by awarding damages to Appellee Joseph that were based solely on his and his families' testimony.

¶ 68 Next, Appellants contend that Appellee Joseph failed to establish that he suffered emotional injury. Appellants claim that Appellee Joseph did not make a claim for mental and emotional stress and that he presented no evidence of medical treatment for such stress. Appellants also claim that those same injuries, emotional and social, that were the result of the Defamatory Articles were actually caused by a 1997 automobile accident. Once again, as in *Wilson,* Appellee Joseph's testimony regarding the humiliation and emotional stress that resulted from the Defamatory Articles was sufficient to prove compensable damages. Accordingly, we find no error by the trial court, and, consequently, Appellants' contention is without merit.[24]

¶ 69 Regarding the compensatory damages to Appellee Joseph, Appellants' final contention states that Appellee Joseph failed to prove that the Defamatory Articles caused harm to his reputation. However, the testimony of Appellee Joseph and his family belie Appellants' contention. Appellee Joseph testified that his life became a "nightmare" following the publication of the articles in August of 2001 that linked him to drug trafficking at Lavelle's Pub. N.T. Trial vol 1., 5/16/2007–5/19/2007, at 137, 327–328. Appellee Joseph's daughter also testified regarding the adverse effects of the Defamatory Articles on her father and his reputation. *Id.* at 614–19. Accordingly, we find that the evidence presented supports the conclusion that the publication of the Defamatory Articles caused actual harm to Appellee Joseph. Appellants' final contention as to the compensatory damages to Appellee Joseph fails.

■ ¶ 70 The trial court awarded damages to Appellee Acumark in the amount of $1.5 million for the harm to its reputation in the community as evidenced by lost profits. Trial court opinion, 3/28/2007, at 45.

¶ 71 Appellants contend that the trial court based its award on speculative expert testimony of Andrew Verzilli[25] in that Appellee Acumark's own financial records show that there was no basis for Mr. Verzilli's assumption of ever increasing revenues and profits. Appellants allege that Appellee Acumark's loss of profits may have derived some other source, namely, the loss of revenue from Appellee Joseph's airport limousine services. Appellants' assailment on Mr. Verzilli's assessment of Appellee Acumark's loss of profit was quintessentially a challenge to the credibility of Mr. Verzilli's findings. However, as long as it was reasonable to infer that Acumark's loss of profits was a result of

24. Appellants also contend that a plaintiff in a defamation action cannot satisfy the burden of proving actual injury based solely on an allegation of humiliation and emotional distress. As we noted above, the trial court correctly found that Appellee Joseph sufficiently proved compensable damage to his reputation in the community.

25. Mr. Verzilli was hired by Appellees to testify regarding the financial impact of the publication of the Defamatory Articles on Appellee Acumark's business revenue.

the Defamatory Articles, the evidence was sufficient to sustain Appellee Acumark's burden of proof. *Cooke v. The Equitable Life Assurance Society,* 723 A.2d 723, 728 (Pa.Super.1999).

¶ 72 The trial court found evidence credible that Appellee Acumark suffered economic loss caused by the Defamatory Articles. The Defamatory Articles incorrectly alleged that Appellee Acumark was involved in laundering money with Appellee Joseph and his airport limousine services. The Defamatory Articles alleged that the money laundering began with *The Metro* and continued with Appellee Acumark. Appellee Acumark presented evidence that business losses followed the publication of the Defamatory Articles in the *Citizens' Voice. See, e.g.,* N.T. Trial vol. 1, 5/16/2007–5/19/2007, at 729–30 (group of Appellee Acumark's core customers stopped doing business when articles published in August of 2001), *id.* at 529–31 (political customers stopped using Appellee Acumark after publication of articles); *id.* at 406–08 (customer stopped business with Appellee Acumark after Appellee Acumark linked to prostitution, drug trafficking, and guns). The trial court concluded that the Defamatory Articles caused Appellee Acumark's damages.

¶ 73 In computing the $1.5 million compensatory award, the trial court considered the testimony of Mr. Verzilli credible and used it to compute lost profits. However, the trial court reduced Mr. Verzilli's calculation to reflect the amounts attributable to damages allegedly suffered by Appellee Joseph's airport limousine service, which did business with Appellee Acumark. Trial court opinion, 3/28/2007, at 45. In fashioning its award, the trial court also considered the harm to Appellee Acumark's reputation in the community. *Id.* at 45. We find that the trial court's award to Appellee Acumark was not speculative but was based on credible evidence of actual damages to Appellee Acumark; accordingly, Appellants' final issue fails.

*CONCLUSION*

¶ 74 We agree with the trial court's conclusion that the "gist" of the Defamatory Articles was not a fair and accurate summary of the federal investigation involving Mr. D'Elia, Appellees, Mr. Marranca, and Ms. Stanton, which resulted in a falsehood against Appellees. The May 31st searches of Appellee Joseph's home and Appellee Acumark's office was to investigate alleged money laundering involving Mr. D'Elia. The federal probe into the illegal activity at Lavelle's Pub appeared to be a separate probe of a separate criminal enterprise— drug trafficking and money laundering. However, a fair reading of the eight Defamatory Articles implied that the investigations were interrelated.

¶ 75 Further, the Defamatory Articles failed to provide an explanation that the matters asserted in the affidavits were unproven allegations or not established facts. The articles also indicated that Appellees were under video surveillance; but, video surveillance of Appellees was not mentioned in the affidavits. Further, the affidavits did not contain any allegations of drug trafficking, gun running, or prostitution connected to Appellees. The Defamatory Articles implied that Appellee Joseph's airport limousine businesses were involved in transporting various forms of contraband. However, Appellee Joseph never received a target letter from federal investigators. Appellees proved these allegations were false.

¶ 76 Additionally, we agree that the Appellants acted negligently in publishing the Defamatory Articles by failing to abide by their own journalistic code when using unnamed sources. Appellant Lewis, and not an editor, granted confidentiality to the source. From the evidence presented, there appeared to be very little editorial oversight of the use of unnamed sources.

¶ 77 Appellees proved that the Defamatory Articles cause actual injury in harm to the reputation of Appellees and lost profits to Appellee Acumark.

¶ 78 Further, Appellants failed in its burden to prove that Appellees were limited purpose public figures and, therefore, Appellees were not required to prove Appellants acted with actual malice. The trial court conclusion correctly weighed Appellants' First Amendment protections against Appellees' expectation of privacy concerns as private figures.

¶ 79 The trial court correctly concluded that Appellee Joseph and Appellee Acumark proved their defamation action against Appellants pursuant to 42 Pa. C.S.A. § 8343(a) and Appellants failed in its rebuttal pursuant to 42 Pa.C.S.A. § 8343(b)(1). Accordingly, we affirm the judgment entered in favor of Appellees and against Appellants.

¶ 80 Judgment affirmed.