J-A25008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| RICHARD RANSOM | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ICTV BRANDS, INC AND KELVIN | : | No. 891 EDA 2023 |
| CLANEY | : | |

Appeal from the Judgment Entered April 4, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180401597

| | | |
|---|---|---|
| RICHARD RANSOM | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ICTV BRANDS, INC AND KELVIN | : | |
| CLANEY | : | |
| | : | No. 1010 EDA 2023 |
| | : | |
| APPEAL OF: KELVIN CLANEY | : | |

Appeal from the Judgment Entered April 4, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180401597

BEFORE: OLSON, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY OLSON, J.: **FILED FEBRUARY 10, 2025**

In these consolidated appeals, Appellant, Richard Ransom, ("Ransom")

appeals and Appellee/Cross-Appellant, Kelvin Claney, ("Claney")

cross-appeals from the April 4, 2023 judgment entered in the Court of

Common Pleas of Philadelphia County following the conclusion of a non-jury

trial. The trial court found in favor of Ransom in his contract and

employment-based claims against ICTV Brands, Inc. ("ICTV") and Claney, and a judgment was subsequently entered in favor of Ransom, as set forth in greater detail *infra*. We affirm.

The trial court summarized the procedural history as follows:

On April 12, 2018, [] Ransom filed a complaint averring that [] ICTV and [] Claney breached a written agreement signed on January 1, 2017, that governed the terms of Ransom's employment as the company's president. [In response to preliminary objections, Ransom filed a first amended complaint on May 22, 2018.] He alleged three counts: Count [I] - breach of contract; Count [II] - violation of Pennsylvania Wage [Payment] and Collection Law;[1] and Count [III] - defamation. [ICTV and Claney subsequently filed preliminary objections to Ransom's first amended complaint, which were overruled on September 17, 2018.] On October 29, 2018, [] ICTV and Claney filed an answer with new matter raising various defenses, including termination for cause, and asserted a counterclaim for declaratory judgment, breach of fiduciary duty[,] and misappropriation/conversion[.]

Various pre-trial motions were filed and decided, and none are in dispute here. On May 20, 2021, a [non-jury] trial commenced *via* [a video conferencing platform due to the COVID-19 global pandemic] and continued for eight [] days through the spring and summer [of 2021].

Trial Court Opinion, 1/3/24, at 2 (extraneous capitalization omitted).

At the conclusion of the non-jury trial, the trial court made the following findings of fact:

1.   A bench trial *via* [a video conferencing platform] took place on scattered dates during the spring and summer of 2021.

---

[1] 43 P.S. §§ 260.1 – 260.13.

2. The case involves a boardroom struggle that ended with the termination of [Ransom's] employment as president of [ICTV].

3. Individual defendant [Claney] was ICTV's chairman of the board. He was also employed as ICTV's chief executive officer [("CEO")].

4. Ransom began his employment at ICTV in July 2008[,] as the company's director of finance. He was promoted to chief financial officer [("CFO")] in December 2008[,] and continued in that role through 2013.

5. In 2011, ICTV's board of directors, with Claney as chair, selected Ransom to be the company's president. Ransom served thereafter as both [CFO] and president until a new CFO was selected two years later. The new CFO reported directly to Ransom through March 20, 2018.

6. At all times relevant to the events of this case, ICTV was a direct marketing business with a niche in developing audio/visual advertisements for cable television. Claney was the company's production specialist, and he enjoyed a positive reputation with ICTV's board members and [employees] for his creativity and marketing savvy. In his employment role as CEO, Clancy favored a corporate strategy that involved marketing the manufactured products of other companies especially in the health and cosmetic industries.

7. At all times relevant to this case, ICTV was a publicly [traded] corporation registered with the Securities Exchange Commission ("SEC").

8. Evidence established that Ransom's job as president was to develop ICTV's business prospects while also administering the company's operations under the authority of CEO Clancy. Evidence at trial from multiple witnesses establish[ed] that both men worked harmoniously for many years, but trouble developed in late 2017.

9. By December 2017, Ransom was implementing an alternative vision for the company which involved purchasing manufacturing companies whose products ICTV would market as its own. Ransom's strategy caused ICTV to take on new debt purchased by new shareholders, some

of whom joined the company's board of directors and favored Ransom's approach.

10.  [Ransom] openly discussed an ambition to succeed Claney after Claney [] signed an employment agreement with ICTV on January 1, 2017[] ("Claney employment agreement"). On March 9, 2018, [] Ransom did so in a conversation with Ernest Kollias, Jr., ICTV's [CFO ("Kollias")], though the [trial] court [was] not persuaded that Kollias was credible at trial when he characterized Ransom's conversation as an "ultimatum." The [trial] court [found] Kollias's testimony [was] biased against Ransom and defensive about his own role in the chain of events that led to Ransom's ouster. An example of his biased role is Kollias's letter to the board of directors on March 20, 2018[,] at 7:24 [a.m.] Kollias had written the board that Ransom was planning to take a "sabbatical" in the [United Kingdom ("U.K.")] during the summer of 2018 - even though Kollias knew that the board[,] at its December 17, 2017 meeting[,] had given permission to Ransom to spend the summer of 2018 in the U.K. to work on business development for ICTV's U.K subsidiary. The board granted travel and housing allowances and was aware that Ransom's family would be with him during the summer. Kollias had been present at the December 17, 2017 board meeting where this had been discussed and approved.

11.  That Ransom wanted to be Claney's successor is certain, but defense claims that Ransom was planning to try to replace Claney in 2018[,] are not proven, nor was it shown how [Ransom] would [replace Claney]. While Ransom was aware that Claney wished to renegotiate his own employment contract to extend his time as CEO, [Ransom] testified that he had not spoken to any board members about this and was not opposed to it. [A]s of March 20, 2018, the ICTV board had neither approved an extension of Claney's time as CEO, nor had it been formally proposed.

12.  Claney's existing employment agreement [] protected Claney in much the same way as Ransom's employment agreement[.] Any change in Claney's substantive responsibilities as CEO would trigger "termination without cause" provisions that would have been costly to ICTV. The Claney employment agreement specifically states that ICTV promised Claney that he would serve "the company as

[CEO] during the first three years of the term of this agreement, and thereafter as creative director."

13. As the first three months of 2018 proceeded, [] Claney made attempts to lower the option price of ICTV [stock] shares available to ICTV employees. Ransom opposed this idea as susceptible to [an] insider trading inquiry [by the SEC.] Ransom was credible when[,] on cross[-]examination[,] he testified that he believed lowering the option[] price might test SEC insider trading rules. []Ransom did not want to be part of the option[] plan[,] and [] Claney would have potentially benefitted from the option[] price reduction if the board approved the change.

14. During the week of March 8, 2018, Ransom travelled to Europe on a business trip for ICTV. He returned to his office at ICTV headquarters in Wayne, [Pennsylvania] for the first time on March 20, 2018[,] at approximately 8[:00 a.m.]

15. Shortly before[,] at 7:24[ a.m.,] Kollias [] sent to Claney and the rest of the ICTV board the [electronic mail ("email")] previously referenced at Exhibit P-208A. By the time Ransom arrived at his office, Claney [] already decided to strip substantive responsibilities from Ransom's job as ICTV president. These changes included taking away Ransom's management of ICTV's international projects in the [U.K.] and China, along with direct supervision of ICTV's in-house legal counsel, ICTV's finance officer, [and] ICTV's marketing officer.

16. A few days later, Claney barred Ransom from his own office at [ICTV] headquarters.

17. Paragraph 8 of Ransom's June 1, 2017 employment agreement provides that if Ransom is terminated without cause, he is entitled to:

> "a lump sum payment on the date of his termination equal to his base salary through the remaining term of this agreement[."]

18. [] Ransom's base salary at the time was $225,000[.00] as provided at Paragraph 2 of [] Ransom's June 1, 2017 employment [agreement].

19. Paragraph 8(b)(i) of Ransom's June 1, 2017 employment agreement states in pertinent part that a termination without cause occurs when:

> "Employee's substantive responsibilities are changed without the prior approval of the employee[."]

20. [T]he orders of Claney on March 20, 2018[,] were substantive changes to Ransom's job responsibilities as president, as was Claney's order on March 26, 2018[,] to bar Ransom from his office.

21. [W]hen Ransom was locked out [of ICTV's headquarters], he not only lost access to his business files but also his ability to supervise ICTV [employees] in addition to ICTV's legal counsel and finance officer. [S]upervision of all these staffers were part of Ransom's substantive job responsibilities before March 20, 2018[,] as seen in the organizational chart admitted into evidence[.]

22. [A]fter Ransom was relieved of substantive responsibilities, Claney and the ICTV board of directors engaged in pretextual conduct to try to convert Ransom's termination without cause into a termination with cause.

23. The [] following events took place:

a. CFO [Kollias] sent an email to CEO Claney at 7:24 [a.m.,] on Tuesday, March 20, 2018[,] that a "serious governance issue" had arisen that related to the relationship between Ransom and Claney.

b. Claney reacted within the hour to strip Ransom of direct supervision of legal counsel John Carrino [("Carrino")] in a written statement as follows: ["]Please take this email as formal notice that from this moment on [Carrino] in all his capacities is to cease reporting to the president of ICTV and in all his capacities from this moment on is to report directly to [Claney as CEO of ICTV.] Such capacities include but are not limited to, [human resources,] patents/trademarks[,] intellectual property[,] and all general legal duties, including contracts."

c. This was followed moments later with another email [] from [] Claney at 8:02 [a.m.,] on March 20, 2018. This time[,] Claney's email was to Nikki Kearney, ICTV vice president of marketing [("Kearney")], who [was] on the ICTV organizational [chart] as directly reporting to Ransom.

d. Claney's 8:02 [a.m.] email to Kearney stated, "Nikki, please see the below email (referring to Exhibit P-209A); would you please immediately change ICTV's org[anizational] chart to show [] Carrino reporting directly to the CEO and not the president. Send a copy to me, but no need to send out to all the [employees] right at this moment - I will inform you when it is time to do that[."]

e. Ransom emailed a response to Claney's 8:00 [a.m.] email at 8:03 [a.m.,] on March 20, 2018[, stating,] "Let it be noted that I disagree with this decision.["]

f. At 9:21 [a.m.,] on March 20, 2018, [] Kearney sent an email to Claney confirming that she [] carried out Claney's directive. Kearney wrote as follows: "Per your request, I have attached the updated org[anizational] chart with this change. Please let me know if you need anything else. Thank you."

g. At 9:23 [a.m.,] on March 20, 2018, Ransom sent an email [] to Claney, with a copy to all ICTV board members, advising that he believed these changes constituted a violation of his employment agreement. In part, he quoted from his employment agreement as follows: "During the entire term of his employment, employee shall be responsible for carrying out all aspects of the business operations of [ICTV]. Employee shall serve under the direction and supervision of the company's [CEO] and board of directors[."]

h. At 9:55 [a.m.,] on March 20, 2018, Ransom sent an email to Kavita Sahai of 21 Drops advising that ICTV [declined to pursue] a business opportunity [that involved] taking a 21 Drops product line to the [U.K.] market or anywhere else.

i.   This notification to 21 [Drops] was confirmed and acknowledged [in an] email [sent] at 9:55 [a.m.] from Cary Claster, founder of 21 Drops.

j.   At 7:16 [p.m.,] on March 20, 2018, Claney sent an email to both Ransom and Kollias spelling out specific changes involving how, and to whom, Kollias was to perform his duties as CFO. The email convey[ed] another change in Ransom's substantive responsibilities which had included supervisory responsibility over the CFO. In the second to last sentence of the 7:16 [p.m.] email, Claney wrote: "Further from this moment on, the CFO is to report directly to the CEO, not the president and the org[anizational] chart is to change to reflect this[."]

k.   On March 25, 2018, the same day that Ransom was locked out [of the company's headquarters], the ICTV board, under Claney's signature[,] sent Ransom a "Notice of Intent to Terminate[,]" a document which purportedly gave Ransom thirty days to cure. [] ICTV's declared reasons were Ransom's failure to carry out his responsibilities in a 'professional manner' which if not cured would result in termination. The unprofessional conduct cited was "numerous insubordinate and unprofessional responses delivered by you in front of staff members, plus numerous unprofessional responses to decisions ultimately made by the CEO, which have created unacceptable working conditions for the company's employees, which lead to a decline in the company's performance. Two specific examples given were "your refusal to cancel your intended trip to China next month, and your refusal to inform the representative of the product known as [`]ReliefBand['] that ICTV will not be marketing this product."

l.   [] Ransom had not known of Claney's decision to stop Ransom's business trip to China until after March 20, 2018, and by March 26, 20[18], Ransom [] cancelled the previously booked travel arrangements. This was done within the thirty day "cure" period.

m. [] Ransom also followed Claney's directive to cancel ICTV's relationship with ReliefBand. There are no emails or writings that record[ed] this, but [] Ransom's testimony on this point is credible as he is corroborated by Christopher Dominello [("Dominello")], a businessman who [] worked as a product-finder [and] who linked ICTV to ReliefBand, a health product manufacturer. Ransom [] wanted ICTV to acquire [ReliefBand] as part of Ransom's business strategy. Dominello testified, "I did get a call from [Ransom] that he couldn't do ReliefBand anymore [because] their plan was not to do external products anymore. They were only going to focus on their products. That was the directive that he had so he couldn't - they don't do any external products anymore[."  ]Ransom [] cancelled ReliefBand during the thirty[-]day "cure" period.

n. On the amorphous charge of "unprofessionalism[,"] the evidence reflects a professional disagreement between [Ransom and Claney] over the company's business strategy, a strategy that was not theirs to control or decide unilaterally. While a rivalry appears to have been brewing by the beginning of 2018, the [trial] court was shown no persuasive evidence that Ransom was insubordinate or unprofessional in his dealings with board members or ICTV [employees]. The [trial] court does not find that [Ransom's] email to members of the board on March 20, 2018[,] was unprofessional under the circumstances when he warned them, as company president, that he believed his employment agreement was being violated.

24. In any event, Ransom had already been terminated involuntarily before the March 25, 2018 notice of intent to terminate. Of relevance in reviewing the wage and defamation claims in this case is what happened after the board issued its March 25,2018 notice and its 30[-]day offer to cure. [] ICTV and Claney were not straight forward and pursued alleged travel expense fraud by Ransom as a pretextual reason to terminate with cause. Th[e trial] court, however, [found] there was no such fraud.

25.     Additionally, especially given Ransom's banishment from his own office, [] Claney's and ICTV's line-by-line review of years of Ransom's expense reporting shows bad motive and ill[-]will, and the investigation into travel expense fraud does not correlate with the reasons given by the board in its notice of intent to terminate. This pretextual conduct, tortious in nature, was followed by what [] was defamatory conduct by Claney individually with actual malice, and by ICTV negligently, in connection with the submission of ITEM 5.02 as part of ICTV's April 23, 2018 Form 8-K Current Report to the SEC.

26.     Concerning the alleged travel and entertainment expense fraud of Ransom, the [trial] court [found] this is untrue. Testimony on this was heard over two days but Claney and ICTV failed to show that Ransom's accounting of his travel and entertainment expenses was deceitful. For example, Ransom's explanation of why a few hundred dollars of cash [was] withdrawn during various international trips was credible[,] and the [trial] court accept[ed] his testimony that it was necessary for him to charge his corporate credit card small sums of money to obtain petty cash in foreign currency for expenses like local taxi fares.

27.     Hours of testimony revolved around expenses for "Gentlemen's Club" entertainment that were charged by Ransom as business expenses totaling less than $1[,]500.00 over several years. [] Ransom['s testimony] was credible that these Gentlemen's Club events were entertainment expenses for corporate clients that were not forbidden by then[-]existing corporate policy, regulations, or protocol. Actual expenses for these events were accurately reported and accounted for.

28.     On facts directly relating to Ransom's defamation claim, the [trial] court [] reviewed Exhibit P-391, ICTV's Form 8-K Current Report dated April 23, 2018. ITEM 5.02 at the top of the second page of the [Form 8-K] Current Report has an entry that states:

        "On April 18, 2018, the board of directors [] of ICTV [] terminated the employment agreement of its president, [] Ransom [`]for cause['] as such term is defined in his employment agreement. The board terminated [] Ransom's employment agreement because of certain breaches

- 10 -

thereunder. **[ICTV] is currently performing an internal investigation concerning potential additional breaches by [] Ransom of his fiduciary duties to the company and other contractual, statutory[,] and common law violations.**"

29. The [] bolded ITEM 5.02 language is false as the phrase "concerning additional breaches by [] Ransom of his fiduciary duties to the company" is false. The [trial] court [did] not find that there were any breaches of fiduciary duty by [] Ransom as implied by the ITEM 5.02 use of the phrase "additional breaches by [] Ransom of his fiduciary duties[."] The [trial] court found ICTV's ITEM 5.02 would cause a reasonable person to believe 1) that there have already been violations of fiduciary duties by Ransom and 2) that there were other [] fiduciary duty violations suspected including statutory and common law ones. These could reasonably suggest negligence, fraud, or criminal activity. In any event, the [trial] court [found] no evidence of any such "additional violations.["]

30. The [] Item 5.02 language stating that Ransom was under investigation for "other contractual, statutory[,] and common law violations" is not true as there is no evidence presented by [ICTV or Claney] to show any contractual, statutory, or common law violation at all. Ransom could not be investigated legitimately as stated by ITEM 5.02 when there were no original violations.

31. [S]eparately, [] the second sentence in ITEM 5.02A is [also] not true since its reference to termination of [] Ransom's "employment agreement because of certain breaches thereunder," is misleading by innuendo because a reasonable person could incorrectly believe Ransom had been terminated for cause.

32. The [] testimony of defense witness Gerald Gritter, ICTV's longtime securities compliance attorney[, ("Gritter")] was credible that ITEM 5.02's third sentence was added at the sole insistence of Claney. Again, the sentence reads: **"[ICTV] is currently performing an internal investigation concerning potential additional breaches by [] Ransom of his fiduciary, duties to the company and other contractual, statutory[,] and common law violations."** [] Gritter's testimony was

credible that he did not draft this language for ICTV and that Gritter did not believe it should have been included in the April 23, 2018 Form 8-K Current Report. In Gritter's words, "The third sentence was added because he (Claney) wanted to go further. I prepared the initial draft of that 8-K with the first two sentences, content, short, sweet to the point. I was willing to stop there. I didn't think we needed to go further."

33. [] Claney had final authority in what went into the April 23, 2018 Form 8-K Current Report and the [trial] court accept[ed] Gritter's testimony that it was Claney, and Claney alone, who gave final approval for ICTV's Form 8-K Current Report dated April 23, 2018 and its false third sentence. []Claney acted with actual malice when he orchestrated the drafting of this sentence and submitted it as part of his company's April 23, 2018 Form 8-K Current Report.

34. No evidence was introduced at trial that the April 23, 2018 Form 8-K Current Report has ever been amended or modified. It remains published, as is, to this day. [] ICTV's board [] acted negligently in its failure to oversee Claney's initial submission of the April 23, 2018 Form 8-K [Current Report] and continues to act negligently if it fails to correct it.

35. The [trial] court observed and heard [] Ransom's testimony. Ransom was sincere and credible when he explained his actual defamatory damages as follows:

[Ransom:] "The only thing I'll say, Your Honor, is I'm 42 years old. I've worked really hard to establish a reputation of being honest, of being forthright with my employers. I've always dedicated myself, as you could see from the amount of travel, the amount of effort I put into this.

And in a few sentences on a public forum that I believe even you referenced, anyone can [] find very quickly [*via* an internet search] if you put my name and ICTV [] together. I

> will have this chasing me the rest of my life as long as that's out there.
>
> And I don't know what damages will be long-term, but this has caused me stress. It's caused me, you know, will this come up, with these people if I'm in a negotiation or a meeting or anything like that. So that's what this has done to me, Your Honor. And it's just not true and it's not fair."

36. On May 2, 2018, ICTV filed a separate Form 8-K Current Report. This new SEC publication has nothing to do with Ransom. Instead, [] it was a fulfillment of Claney's effort to have ICTV authorize new stock options as objected to by Ransom. Now, however, the lCTV board's authorization was for Claney's benefit only, and no one else.

37. [] ICTV's board, just weeks after Ransom was removed, authorized the sale of 210,000 shares of convertible preferred stock to Claney, payable at 8% interest per year at a value of $1.92 per share. These preferred shares were redeemable within three years. The board's authorization states that if Claney were not to seek redemption within the three years, he could convert his new preferred shares to ICTV common stock at the ratio of eight common shares for each preferred share.

38. Pertinent portions of the May 2, 2018 Form 8-K Current Report follow:

> **ITEM 1.01 Entry into a Material Definitive Agreement.**
>
> *Creation of Series A Preferred Stock*
>
> On May 1, 2018, the board of directors of ICTV [] designated 210,000 shares of the company's preferred stock, par value $0.001 per share, as Series A preferred stock (the "Series A preferred stock"), and authorized the sale of the Series A preferred stock to [] Claney. On May 2, 2018, the board of directors of the company filed the certificate of designation, preferences, rights[,] and limitations of the Series A preferred stock (the "certificate of designation") with

the Nevada secretary of state. A copy of the certificate of designation is attached to this Current Report on Form 8-K as Exhibit 4.1.

The Series A preferred stock has dividend rights per share equal to the dividend rights of the company's common stock and has a liquidation preference in the amount of $1.92 per share. Each share of Series A preferred stock is entitled to 100 votes on all matters to be voted upon by the company's shareholders. The Series A preferred stock is redeemable at the option of the company for a redemption price per share of $1.92, plus 8% per [year] from the date of issuance until the date of redemption. If any Series A preferred stock is not redeemed within three years from the date of issuance, the holder may convert the Series A preferred stock into common stock at a ratio of eight shares of common stock for each share of series A preferred stock. The Series A preferred stock is a non-certificated security.

*Issuance of Series A Preferred Stock*

On May 2, 2018, the company and [] Claney, the company's [CEO], entered into a subscription agreement (the "subscription agreement") pursuant to which the company issued to [] Claney 210,000 shares of Series A preferred stock for cash consideration of $403,200[.00], or $1.92 per share. A copy of the subscription agreement is attached to this Current Report on Form 8-K as Exhibit 10.0.

**ITEM 3.02 Unregistered Sales of Equity Securities.**

The information set forth under ITEM 1.01 regarding the subscription agreement and the issuance of the Series A preferred stock is incorporated by reference into this Item 3.02. The issuance of these securities is being made in reliance upon an exemption from registration provided under Section 4(a)(2) of the Securities Act of 1933, as amended.

**ITEM 9.01 Financial Statements and Exhibits.**

(d) Exhibits

The following exhibits are filed herewith:

| Exhibit No. | Description of Exhibit |
| --- | --- |
| 4.1 | Certificate of Designation of the Series A preferred stock, filed With the Nevada secretary of state on May 2, 2018 |
| 10.1 | Subscription agreement dated May 2, 2018 between ICTV [] and [] Claney. |

39. The [trial] court [took] judicial notice that ICTV's authorization in May 2018[,] to pay Claney a fully redeemable security worth $403,200[.00] at 8[%] per year[,] was made at a time when ordinary interest on treasuries and money market funds was in the 1[%] range or less. The [] ICTV stock option gave Claney an option to [own] 1,680,000 common shares through conversion of the 210,000 preferred shares *in lieu of* redemption. In other words, this special ICTV option - available to Claney only - gave Claney a chance to [own] 1,680,000 common shares at the May 2018 price of $1.92 and benefit from any rise over three years in ICTV's common stock value. Hypothetically, if in May 2021, ICTV's common stock was priced at $2.92 [per] share, Claney would be eligible to own [1,680,000] common shares worth [$4,905,600.00] on the $403,200[.00] he invested.

40. The [trial] court's damages calculations for breach of contract are based on the termination without cause provisions of Ransom's employment agreement. [] ICTV owes Ransom $608,422[.00] for lost salary, but we decline to award Ransom the value of [1,000,000] ICTV common shares on March 20, 20[18,[2]] for lack of admissible evidence. We may not take judicial notice of this value. [] Ransom is entitled to pre[-]judgment interest at the legal rate of 6% on the $608,422[.00] since March 20, 2018. This sum is $174,412.49. Therefore, the aggregate damage for ICTV's breach of contract and termination without cause is

---

[2] Pursuant to the termination without cause provisions of Ransom's employment agreement, ICTV was required to award Ransom 1,000,000 shares of ICTV common stock upon termination. *See* Plaintiff's Exhibit P-1.

$728,834.49 which shall be paid to Ransom by ICTV, plus interest going forward.[3]

41. In addition to breach of contract, [] the termination "without cause" provision in Ransom's employment agreement is a severance pay provision that is governed by a labor statute.

42. [] Claney exercised a policy-making function at ICTV but was not solely responsible for the finances of ICTV, a responsibility which resided with the board of directors.

43. [Ransom is not] in breach of fiduciary duty to ICTV.

Trial Court Findings of Fact and Conclusions of Law, 7/20/22, at 1-10 (extraneous capitalization and record citations omitted; emphasis in original).

On Ransom's claim for breach of contract against ICTV (Count I), the trial court found in favor of Ransom and awarded him $803,422.00 in damages. *Id.* at 13. On the claim of violation of the Wage Payment and Collection Law (Count II), the trial court found in favor of Ransom and against ICTV and awarded $608,422.00 in damages plus attorney's fees and litigation costs. *Id.* The trial court did not find that Claney violated the Wage Payment and Collection Law.[4] *Id.* Finally, on the claim for defamation (Count III) as

_____

[3] In a subsequent order granting Ransom's and ICTV's post-trial motions to correct a typographical error, as discussed *infra*, the trial court recognized that the aggregate award of damages was $782,834.49 and not $728,834.49. **See** Trial Court Order, 11/16/22, at ¶3.

[4] The trial court stated,

Although Claney exercised policy responsibilities, he was not solely responsible for the finances of ICTV. The [trial] court[,] therefore[,] concludes that he is not personally liable for violations against Ransom under the Pennsylvania Wage [Payment] and Collection Law.

- 16 -

it related to Claney, the trial court awarded Ransom $250,000.00 for compensatory damages and $300,000.00 for punitive damages. *Id.* As the defamation claim related to ICTV, the trial court awarded Ransom $200,000.00 for compensatory damages caused by ICTV's negligence but stated that this award could be mitigated to a "nominal amount" if ICTV filed an amended Form 8-K Current Report with the SEC to remove any defamatory remarks against Ransom. *Id.* The trial court also found in favor of Ransom on ICTV's counter-claims for declaratory judgment, breach of fiduciary duty, and misappropriation or conversion of corporate funds. *Id.* at 13-14.

On August 1, 2022, Ransom filed a motion for post-trial relief. Ransom's Post-Trial Motion, 8/1/22. In his motion, Ransom asked the trial court to modify its compensatory damage award for Count III – defamation as to Claney to include "special harm damages" in the amount of $803,422.00,[5] which Ransom averred was his "actual economic harm and pecuniary loss." *Id.* at ¶¶5-18. Ransom also requested that the trial court modify the verdict to include the value of his 1,000,000 shares of ICTV common stock, which, according to Ransom, were valued at $195,000.00. *Id.* at ¶¶19-30. In a motion for additur, Ransom asserted that the punitive damages award of

_____

Trial Court Findings of Fact and Conclusions of Law, 7/20/22, at 11.

[5] According to Ransom, $803,422.00 was the amount he was entitled to receive under the termination without cause provisions of his employment agreement, *i.e.* lost salary plus interest. Post-Trial Motion, 8/1/22, at ¶8.

$300,000.00 against Claney on Count III – defamation was "not reasonably related to the interest in punishing and deterring [Claney's] conduct" and requested that the trial court award additional punitive damages. *Id.* at ¶¶31-58. Finally, Ransom requested that the trial court correct a typographical error in the damages award. *Id.* at ¶¶56-60.

On August 11, 2022, ICTV filed a motion for post-trial relief, requesting that the trial court correct a mathematical error in calculating the pre-judgment interest. ICTV's Post-Trial Motion, 8/11/22. On August 23, 2022, ICTV and Claney filed a joint answer in opposition to Ransom's motion for post-trial relief. Ransom filed a reply to the joint answer in opposition on September 1, 2022, and ICTV and Claney filed a response on September 12, 2022.

On November 16, 2022, the trial court denied Ransom's requests for post-trial relief but agreed to correct a typographical error in the damages award.[6] Trial Court Order, 11/16/22. In that same order, the trial court scheduled an evidentiary hearing on December 14, 2022, to determine the

_____

[6] ICTV and Claney, by way of a post-trial motion, asked the trial court to recalculate the pre-judgment interest added to Ransom's recovery. Although the trial court purported to grant the post-trial motion filed by ICTV and Claney, the trial court, in fact, merely corrected a typographical error in the aggregate damage award ($782,834.49 verses $728,834.49), but did not recalculate the pre-judgment interest. Trial Court Order, 11/16/22, at 2. Instead, the trial court stated that it would review its pre-judgment interest calculations at the evidentiary hearing scheduled to determine an award of attorney's fees and litigation costs as part of Ransom's Pennsylvania Wage Payment and Collection Law claim. *Id.* at 4.

attorney's fees and litigation costs to be awarded against ICTV for its violation of the Wage Payment and Collection law. *Id.* at 3.

At the conclusion of the evidentiary hearing, the trial court denied ICTV's post-trial motion as moot, stating that the pre-judgment interest calculations were reviewed at the hearing and "the parties had no objections to [the trial] court calculations." Trial Court Order, 12/14/22. On April 4, 2023, the trial court awarded attorney's fees and litigation costs to Ransom in the amount of $332,565.76. Trial Court Post-Trial Findings and Order, 4/4/23. In its order, the trial court stated that Claney and ICTV "shall, jointly and severally, pay" Ransom the awarded attorney's fees and litigation costs. *Id.*

On April 4, 2022, the trial court awarded final judgment in favor of Ransom as follows:

1. At Count III – Defamation, [Claney] shall pay [Ransom] an aggregate of $550,000[.00, comprised] of $250,000[.00] in compensatory damages and $300,000[.00] in punitive damages.

2. At Count III – Defamation, [ICTV] shall pay $200,000[.00] in compensatory damages to [Ransom] for the company's negligent defamation. This award may be reduced to a nominal sum of $1.00 upon motion if within [60] days of final judgment, the SEC has expunged all public record of the last two sentences of the offending ITEM 5.02 of ICTV's Form 8-K Current Report dated April 23, 2018.

3. At Count I – Breach of Contract, [ICTV] shall pay [Ransom] $814,147.49. This is an aggregate of $782,834.29 for lost salary as of July 29, 2022[,] plus interest at 6% per year for 8 months going forward through March 1, 2023[,] in the amount of $31,313.20.

4. At Count II – Wage Payment and Collection [Law, ICTV and Claney], jointly and severally, shall pay $814,147.49 in

- 19 -

[lost] salary [] plus interest, [as well as] attorney['s] fees in the amount of $271,382.49 and litigation costs of $61,183.27 for an aggregate total of $1,146,713.01.

5.     [Ransom] may not receive the same award of $814,147.49 for wage and salary loss under both Count I and Count II.

Judgment Order, 4/4/23.  On April 4, 2023, judgment was entered in favor of Ransom and against ICTV and Claney.[7]

On April 5, 2023, Ransom filed a notice of appeal.  On April 15, 2023, Claney filed a motion for reconsideration on the ground that he "should not be liable for damages, attorney's fees[,] or litigation costs based on a claim [for violation of the Wage Payment and Collection Law,] which [was] dismissed and for which he had been explicitly found not liable."  Claney's Motion for Reconsideration, 4/15/23, at ¶17.  On April 19, 2023, Claney filed a notice of cross-appeal.

_____

[7] A review of the trial court docket reveals that, on April 4, 2023, the judgment order, as set forth *supra*, was entered and proper notice was provided to the parties.  That same day, a "trial work sheet" was also entered and notice was provided to the parties.

The judgment order contains a full description of the judgment entered as to each claim and as to each party, while the trial work sheet shows the total judgment amount to be $1,146,713.01.  The figure shown on the trial work sheet represents the award on Count II – violation of the Wage Payment and Collections Law, but does not represent the damages awarded on Counts I or III.

We consider the entry of the judgment order to be a final, appealable order as it disposes of all claims and all parties.  Therefore, we have jurisdiction to review the appeals.  ***See Johnston the Florist, Inc. v. TEDCO Constr. Corp.***, 657 A.2d 511, 514 (Pa. Super. 1995) (*en banc*) (stating, entry of judgment is a prerequisite to the exercise of this Court's jurisdiction).

On July 7, 2023, the trial court, ostensibly in response to Claney's motion for reconsideration and pursuant to Pennsylvania Rule of Appellate Procedure 1701(b),[8] amended the final judgment to remove the joint and several liability language as it pertained to Count II. The revised final judgment, in pertinent part, reads as follows:

> 4.    At Count II – Wage Payment and Collection [Law, ICTV] shall pay $814,147.49 in [lost] salary [] plus interest, [as well as] attorney['s] fees in the amount of $271,382.49 and litigation costs of $61,183.27 for an aggregate $1,146,713.01.

Amended Judgment, 7/7/23.[9]

On July 10, 2023, Ransom was ordered to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).[10] Ransom filed his Rule 1925(b) statement on July 31, 2023, and the trial court filed its Rule 1925(a) opinion on January 3, 2024.

Ransom raises the following issues for our review:

> 1.    Should the trial court's award of compensatory damages for defamation have included damages for loss of severance

---

[8] Pennsylvania Rule of Appellate Procedure 1701(b) permits a trial court, after an appeal has been taken, to, *inter alia*, take such action to "correct formal errors in papers relating to the matter[.]" Pa.R.A.P. 1701(b)(1).

[9] In a separate order, the trial court extended its July 7, 2023 amendment to its post-trial findings and order dated April 4, 2023, which originally provided that ICTV and Claney were jointly and severally liable for a violation of the Wage Payment and Collection Law. **See** Amended Trial Court Post-Trial Findings and Order, 7/7/23.

[10] The trial court did not order Claney to file a Rule 1925(b) statement in his cross-appeal.

mandated by the "termination without cause" clause in the employment [agreement], which was triggered by Claney's defamatory statements to the ICTV board [of directors] accusing [Ransom] of misconduct?

2. Did the trial court erroneously refuse to award damages for the value of ICTV stock, which is not subject to reasonable dispute and which can be determined from sources whose accuracy cannot reasonably be questioned?

3. Was the trial court's monetary award for punitive damages inadequate?

Ransom's Brief at 10-11 (extraneous capitalization omitted).

Claney raises the following issue on cross-appeal for our review:

Did the trial court err in its April 4, 2023 judgment and order when it stated that [ICTV] and Claney were jointly and severally liable on Count II for violation of the Pennsylvania Wage Payment and Collection Law[] where the trial court had previously dismissed Count II against Claney when it granted his motion for nonsuit at the close of [] Ransom's case-in-chief, and where the [trial] court's post-trial findings of fact and conclusions of law specifically stated that Claney "was not personally liable for violations against Ransom" under the [Wage Payment and Collection Law?]

Claney's Brief at 47.[11]

Our standard and scope of review in an appeal from a judgment entered

on a non-jury verdict

is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial [court] must be given the same weight and effect on

_____

[11] In a May 16, 2023 *per curiam* order, this Court, *inter alia*, designated ICTV as a "participant" in both appeals and stated that the designation would become final within 10 days if no response was filed. *Per Curiam* Order, 5/16/23. The parties did not file a response.

appeal as the verdict of a jury.  We consider the evidence in a light most favorable to the verdict winner.  We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*J.J. DeLuca, Co., Inc. v. Toll Naval Assocs.*, 56 A.3d 402, 410 (Pa. Super. 2012) (citation omitted).

In his first issue, Ransom challenges the trial court's award of damages for Count III – defamation as it relates to Chaney.  Ransom's Brief at 39-51. Specifically, Ransom asserts that the trial court failed "to recognize that loss of [his] severance pay mandated by the [e]mployment [a]greement is an item of special damages or 'special harm' recoverable under the common law of tort" and "must be assessed against [Chaney], whose tortious behavior caused [the defamation]." *Id.* at 39-40.

Generally, in tort actions, "[t]he plaintiff bears the burden of proving damages by a preponderance of the evidence[.  T]he amount of damages may be proven by the plaintiff furnishing a reasonable amount of information from which the trial court may fairly estimate the damages without engaging in speculation." *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 344 (Pa. Super. 2008).  "Compensatory damages recoverable for defamation include actual damages recoverable for the proven harm caused by the publication.  Actual damages include general damages and special damages. Actual damages must be established through competent evidence concerning the injury." *Id.* (citations omitted).  "The term 'special damages' is defined

as 'actual economic harm' or 'pecuniary loss.'"[12]  **Pilchesky**, 12 A.3d at 444;

**see also Walker v. Grand Cent. Sanitation, Inc.**, 634 A.2d 237, 241

(Pa. Super. 1993) (defining "special damages" as "monetary or out-of-pocket

loss borne by the defamation"), *appeal denied*, 651 A.2d 539 (Pa. 1994).

Ransom argues that he "proved special damages in the form of the loss

of severance, but the trial [court] refused to award the proven amounts as an

item of damages recoverable by virtue of Claney's defamation."  Ransom's

Brief at 46.  Ransom contends that "Claney's defamatory statements

published to the ICTV [b]oard members – all of whom testified that they

believed [Ransom] to be an honest, hardworking[,] and successful [p]resident

up until Claney's false and defamatory statements began on March 20[,]

2018 – directly resulted in Ransom's termination as ICTV[ p]resident and the

company's refusal to pay him the severance he was due."  **Id.** at 46-47.

Ransom asserts that "Claney's defamatory statements [caused him] 'actual

economic harm' and 'pecuniary loss' in that Ransom was[,] and has continued

to be[,] denied the $803,422[.00] in damages that he was otherwise lawfully

entitled to receive."  **Id.** at 47.

---

[12] General damages include "proof that one's reputation was actually affected by defamation or that one suffered personal humiliation, or both[.]"  **Joseph**, 959 A.2d at 344; **see also Pilchesky v. Gatelli**, 12 A.3d 430, 444 (Pa. Super. 2011) (explaining, general damages include "[i]njury to reputation, impairment of standing in the community, personal humiliation[,] and mental anguish").

In support of its denial of special damages as part of the aggregate damages awarded in favor of Ransom and against Claney in the defamation action (Count III), the trial court explained,

In the case of [] Claney, Ransom proved Claney's actual malice by his conduct leading to the publication of the defamatory third sentence of the Form 8-K Current Report. However, it does not follow that simply because Claney acted with actual malice that Ransom is somehow excused from presenting sufficient evidence at trial to quantify special damages for economic harm.

For purposes of defamation action under Pennsylvania law, special damages are actual[,] concrete damages capable of being liquidated in money. Examples of special damages include actual loss due to withdrawal of trade of customers, or actual loss due to refusal of credit by specific persons, all expressed in figures. Special harm is the loss of something having economic or pecuniary value. In this case[, the trial court] found Ransom offered no evidence of actual economic loss and no special damages were awarded even though Claney's defamatory conduct was done with actual malice.[FN6]

> [Footnote 6:] After his wrongful termination by ICTV, Ransom was hired by ReliefBand, one of the companies he had done business with as ICTV's president.

Trial Court Opinion, 1/3/24, at 23 (citations omitted).

Upon careful consideration, we concur with the trial court, and the record supports, that Ransom is not entitled to recover special damages, *i.e.*, loss of severance pay plus interest, as part of the damages awarded in favor of Ransom and against Claney in the claim for defamation (Count III). As our Supreme Court in **Joseph**, **supra**, explained,

Defamation is a legal cause of special harm to the person defamed if it is a substantial factor in bringing about the harm. A false and defamatory communication is a cause of injury if the harm would not have occurred absent the communication. A false and

- 25 -

defamatory communication is not a cause of injury if it has no connection or only an insignificant connection with the injury.

*Joseph*, 129 A.3d at 429 (ellipsis, brackets, and quotation marks omitted), *citing* **Gertz v. Robert Welch, Inc.**, 418 U.S. 323, 349-350 (1974), Restatement (Second) of Torts § 622A, and Pennsylvania Suggested Standard Jury Instructions (Civil) § 17.190 (4th ed. 2013). Thus, in order to recover damages for special harm as part of a defamation claim, the defamed party must show that the defamatory communication was a substantial factor in, and directly connected to, causing the actual economic harm or pecuniary loss.

In the case *sub judice*, the trial court found, and the record supports, that Claney engaged in conduct, namely ordering substantive changes to Ransom's job responsibilities, that resulted in the involuntary termination without cause of Ransom as president of ICTV on March 20, 2018. **See** Trial Court Findings of Fact and Conclusions of Law, 7/20/22, at ¶¶15-25. It was the involuntary termination of Ransom without cause that triggered the severance payment due under his employment agreement. **See id.** at ¶17 (finding that, Ransom's employment agreement required "a lump sum payment on the date of his termination equal to his salary through the remaining term of [the employment] agreement" if Ransom is terminated without cause). Thus, the harm to Ransom in the form of non-payment of his severance package arose at the moment that he was terminated without cause as ICTV's president. The trial court further found, and the record

supports, that after Ransom's termination on March 20, 2018, Claney and the ICTV board of directors engaged in pretextual conduct intended to demonstrate that Ransom was terminated for cause. *See id.* at ¶24 (finding that, ICTV and Claney "pursued alleged travel expense fraud by Ransom as a pretextual reason to terminate with cause"). The trial court explained that "[t]his pretextual conduct, [while] tortious in nature, was **followed by** what [the trial court found] was **defamatory conduct** by Claney individually with actual malice and by ICTV negligently." *See id.* at ¶25 (emphasis added). The trial court specifically found the defamatory conduct to be "the submission of ITEM 5.02 as part of ICTV's April 23, 2018 Form 8-K Current Report to the SEC." *Id.* Thus, Claney's defamatory conduct, *i.e.*, the drafting and submission of the Form 8-K Current Report to the SEC, did not result in Ransom's entitlement to, and loss of, his severance package. Rather, it was Ransom's involuntary termination without cause and Claney's and ICTV's subsequent pretextual efforts to manufacture unfounded reasons to support Ransom's termination, **prior to** the submission of the Form 8-K Current Report, that triggered Ransom's losses due to the breach of his employment agreement. In other words, the drafting and submission of the Form 8-K Current Report to the SEC was not a substantial factor in, or directly connected to, the damages Ransom sustained because his employment contract was breached. *See Joseph*, 129 A.3d at 429. Therefore, the trial court did not abuse its discretion, or err as a matter of law, when it denied Ransom an

- 27 -

award of special harm damages in the form of loss of his severance package as part of the defamation claim as it pertains to Claney.

Ransom's second issue challenges the trial court's refusal to award the value of 1,000,000 shares of ICTV stock as damages for Ransom's breach of contract claim (Count I) resulting from his involuntary termination without cause. Appellant's Brief at 52-56. The trial court refused to enter the requested award after concluding that it lacked adequate grounds to take judicial notice of the value of the common stock and since Ransom failed to offer admissible evidence of the value of the securities.

> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion[,] the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will, as shown by the evidence or the record, discretion is abused.

*U.S. Bank, N.A. v. Pautenis*, 118 A.3d 386, 391-392 (Pa. Super. 2015) (citation omitted). Pennsylvania Rule of Evidence 201, which governs judicial notice of adjudicative facts,[13] states:

---

[13] Adjudicative facts are facts about the particular parties to the controversy, their activities, their property, and their interests. Facts which help answer who did what, when, where, why, how, and with what motive and intent are all adjudicative. It is to these

### Rule 201. Judicial Notice of Adjudicative Facts

**(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

**(b) Kinds of Facts that may be Judicially Noticed.** The [trial] court may judicially notice a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c) Taking Notice.** The [trial] court:

(1) may take judicial notice on its own; or

(2) must take judicial notice if a party requests it and the [trial] court is supplied with the necessary information.

**(d) Timing.** The [trial] court may take judicial notice at any stage of the proceeding.

**(e) Opportunity to be Heard.** On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the [trial] court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

---

facts that the jury in a jury trial, or the [trial court] in a non-jury trial, applies the existing law. Legislative facts, on the other hand, are used exclusively by the [trial court] when [it] is developing law and policy. They are used not to discover the facts to which the law will be applied, but rather to discover and develop the law itself. Thus, when the [trial court] is interpreting a statute, or ruling on its constitutionality, or creating new law to bridge gaps in existing doctrines, the facts upon which [the trial court] relies are termed legislative facts.

*In Interest of D.S.*, 622 A.2d 954, 957 n.4 (Pa. Super. 1993).

> **(f) Instructing the Jury.** The [trial] court must instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

Pa.R.E. 201.

> It is well-established that,

> A [trial] court may take judicial notice of an indisputable adjudicative fact. A fact is considered indisputable if it "is so well[-]established as to be a matter of common knowledge." Conversely, a [trial] court cannot take judicial notice of a disputed question of fact. By taking judicial notice of a fact so commonly known, the [trial] court avoids the needless formality of introducing evidence to prove an incontestable issue.

> Judicial notice itself does not necessarily establish a fact. Judicial notice of a fact, when correctly taken, constitutes evidence, which like any evidence, may be rebutted. If the evidence derived from judicial notice remains unrebutted, it may support a finding of fact.

*D.S.*, 622 A.2d at 957-958 (citations and footnote omitted); *see also Commonwealth v. Kearney*, 225 A.3d 590 (Pa. Super. 2019). "Judicial notice is intended to avoid the formal introduction of evidence in limited circumstances where the fact sought to be proved is so well known that evidence in support thereof is unnecessary, but should not be used to deprive an adverse party of the opportunity to disprove the fact." *220 P'ship v. Philadelphia Elec. Co.*, 650 A.2d 1094, 1096 (Pa. Super. 1994) (citation omitted); *see also D.S.*, 622 A.2d at 957 (citation omitted).

Here, Ransom asserts that the trial court "erroneously held that it could not take judicial notice of the price of ICTV common stock on March 20, 2018 [(the date of Ransom's involuntary termination without cause)]." Ransom's

Brief at 52-53.  Ransom contends that "on March 20, 2018, ICTV common stock was [publicly] trading at 19.5 cents per share [and] the value of [his] 1,000,000 shares was $195,000.00." *Id.* at 54.  Ransom argues that the trial court should have taken judicial notice of the stock price based on information he provided from a financial website, www.investing.com, which, according to Ransom, "provides real-time data, quotes, charts, financial tools, breaking news[,] and analysis across 250 stock and option exchanges around the world in 44 language editions." *Id.* (original brackets omitted).  Ransom concedes that there are no Pennsylvania judicial decisions addressing judicial notice of, and reliance on, a financial website, such as www.investing.com, for purpose of taking judicial notice of a stock price.  However, "courts interpreting the federal rule [of evidence,[14] similar, according to Ransom, to Pennsylvania Rule of Evidence 201, have taken] judicial notice of the contents of financial web[sites]." *Id.* at 52, 55.  Finally, Ransom contends that neither ICTV nor Claney objected to the trial court taking judicial notice of the March 20, 2018 value of ICTV common stock.  *Id.*

_____

[14] Federal Rule of Evidence 201, governing judicial notice of adjudicative facts, differs from Pennsylvania Rule of Evidence 201, only as to subpart (f), which states as follows:

> **(f) Instructing the Jury.**  In a civil case, the court must instruct the jury to accept the noticed fact as conclusive.  In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

Fed.R.E. 201(f); *see also* Pa.R.E. 201(f).

The trial court explained its rationale for denying Ransom's request to modify the damage award to include the assignment of a value to the 1,000,000 shares of ICTV common stock as follows:

> At post-trial motions[,] Ransom asked the [trial] court to take "judicial notice" of the monetary value of [the ICTV] shares in March 2018. However, he did so with documents submitted after trial and *prima facially* inadmissible, having been copied from a web[site]. Documents such as these would need to be authenticated[ and] admitted through a [] witness subject to examination.

Trial Court Opinion, 1/3/24, at 25.

The record reveals that in its Findings of Fact and Conclusions of Law, the trial court found that Ransom was entitled to an award of loss of salary, as well as 1,000,000 shares of ICTV common stock pursuant to his employment agreement because Ransom was terminated without cause. Trial Court Findings of Fact and Conclusions of Law, 1/20/22, at ¶45. The trial court, however, declined to take judicial notice of the March 20, 2018 value to the shares of ICTV common stock "for lack of admissible evidence." *Id.* In his post-trial motion, Ransom asserted that ICTV's common stock was valued at 19.5 cents per share on March 20, 2018, and attached a screenshot of a financial website purporting to show the stock price.[15] Ransom's Post Trial

---

[15] In his post-trial motion, Ransom asserts that he submitted a print-out of a financial website page showing the stock price of 19.5 cents per share on March 20, 2018, to the trial court as part of his proposed findings of fact and conclusions of law and marked his submission as Plaintiff's Exhibit P-24. Ransom's Post-Trial Motion, 8/1/22, at ¶24 (stating that, page 86, footnote 5

Motion, 8/1/22, at ¶24. Ransom further contends that neither Claney, nor ICTV, objected to the trial court taking judicial notice of the stock price. *Id.* at ¶26.

In their answer to Ransom's post-trial motion, however, ICTV and Claney asserted that the trial court "correctly refused to take judicial notice of the March 20, 2018 stock price where Ransom rested his case[, at trial,] without presenting any evidence regarding the value of[,] or the circumstances under which [Ransom] could legally sell[,] the 'restricted stock' that was referred to in his [e]mployment [a]greement." ICTV's and Claney's Answer, 8/23/22, at ¶22. ICTV and Claney argued that "there had been no opportunity at trial to object to Ransom's post-hoc [evidence] nor was there any opportunity to cross-examine Ransom about his attempt to make use of [the evidence] to establish the value of the [stock.]" *Id.* Moreover, ICTV and Claney asserted that the stock was "restricted" meaning that Ransom was required to hold the stock for a certain period after his termination before he was permitted to sell the stock. *Id.* As such, they contend, "Ransom's post-trial attempt to obtain judicial notice of the March 20[, 2018] trading

_____

of his proposed findings of fact and conclusions of law stated that the stock traded at 19.5 cents per share on March 20, 2018, and that the website screenshot was attached to his post-trial submission as exhibit P-24). A review of the certified record reveals that, on December 13, 2021, the trial court extended the deadline for the submission of proposed findings of fact and conclusions of law to January 7, 2022. *See* Trial Court Order, 12/13/21. The trial court docket, however, does not contain docket entries demonstrating that the parties submitted proposed findings of fact and conclusions of law, and those documents are not part of the certified record.

price of ICTV common stock was untimely, prejudicial, and also irrelevant as the restricted stock could not have been sold or traded as of [the date of termination] but instead was subject to [a] holding period imposed by the SEC[.]" *Id.*

Upon review, we discern no abuse of discretion, or error of law, in the trial court's refusal to take judicial notice of the March 20, 2018 ICTV common stock price and award additional damages as part of the breach of contract claim in the amount of $195,000.00. Ransom did not establish March 20, 2018, as the relevant date for purposes of valuation. Moreover, the screenshot of information, as contained in Ransom's post-trial motion, showing the alleged value of ICTV's common stock on March 20, 2018, does not bear any indication that the information came from a reliable financial website, other than Ransom's assertion that it was obtained from www.investing.com, nor do the columns of data indicate what the various numbers represent, *i.e.*, closing price, opening price, and the highest and lowest trading prices during the trading day. Therefore, the trial court acted within its discretion in concluding that the alleged value of the stock, as represented by Ransom in his post-trial motion, was not capable of accurate and ready determination from a source whose accuracy could not reasonably be questioned.[16] Rule 201(b)(2). Finally, ICTV and Claney contested the

---

[16] Moreover, we concur with the trial court that, with limited exception for evidence discovered after trial, a party, such as Ransom, may not use a

relevancy, and prejudicial nature, of the information provided. Consequently, we discern no abuse of discretion, or error of law, in the trial court's refusal to take judicial notice of the stock value.

In his final issue, Ransom challenges the amount of punitive damages awarded in his favor and against Claney as part of the defamation claim (Count III). Ransom's Brief at 57-71.

Our Supreme Court in *Bert Co. v. Turk*, 298 A.3d 44 (Pa. 2023) recently explained punitive damages as follows:

> Punitive damages have long been a part of traditional state tort law. The common-law method for assessing punitive damages has been recognized in every state and federal court for over two hundred years - since before enactment of the Fourteenth Amendment in 1868. They have been described as "quasi-criminal," and could be described as "private fines" intended to punish the defendant and to deter future wrongdoing. A jury's [or trial court's (in the case of a non-jury trial)] assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation. Punitive damages are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.

---

post-trial motion "as a vehicle for introducing new evidence that it could have submitted prior to the verdict through the exercise of reasonable diligence." *Drake Mfg. Co., Inc. v. Polyflow, Inc.*, 109 A.3d 250, 261 (Pa. Super. 2015); *see also Claudio v. Dean Mach. Co.*, 831 A.2d 140, 145 (Pa. 2003) (stating, "[t]he failure of a party to present sufficient evidence before or during trial to support a decision in that party's favor cannot be cured by a [post-trial motion]"). Here, Ransom could have easily submitted evidence during trial pertaining to the value to the ICTV stock but failed to do so. Post-trial proceedings cannot be a vehicle to cure a party's own errors at trial and transform the trial into "a dress rehearsal." *Drake*, 109 A.3d at 263.

*Bert*, 298 A.3d at 58-59 (citations, some quotation marks, original brackets, and parentheses omitted).

We review an award of punitive damages for an abuse of discretion. *Grossi v. Travelers Personal Ins. Co.*, 79 A.3d 1141, 1157 (Pa. Super. 2013), *appeal denied*, 101 A.3d 103 (Pa. 2014). "Under Pennsylvania law the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 419 (Pa. Super. 2004) (citation and original quotation marks omitted); *see also Grossi*, 79 A.3d at 1157.

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his[, or her,] reckless indifference to the rights of others. In assessing punitive damages, the trier[-]of[-]fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause[,] and the wealth of the defendant.

*Bert*, 298 A.3d at 61-62, *citing* Restatement (Second) of Torts § 908(2); *see also Hollock*, 842 A.2d at 419; *Grossi*, 79 A.3d at 1157. "Punitive damages awards must be tailored to each defendant." *Bert*, 298 A.3d at 71.

Here, Ransom argues that the punitive damages in the amount of $300,000.00 assessed against Claney for his defamatory acts were "not reasonably related to the interest in punishing and deterring [his] misconduct[.]" Ransom's Brief at 57. Ransom asserts that "the award of $300,000[.00] in punitive damages against [Claney] is only $50,000[.00]

- 36 -

more than the $250,000[.00] the [trial c]ourt awarded for 'compensable defamation damages[.]'" *Id.* at 62. Ransom contends that the "$300,000[.00] of punitive defamation damages are in no way 'punitive' as they are not reasonably related to Pennsylvania's interest in punishing and deterring the particular behavior of [Claney.]" *Id.* (emphasis omitted). Ransom argues that both federal and state courts "almost always award punitive damages in excess of the compensatory damages[.]" *Id.* at 66 (citing cases where the ratio of punitive damages to compensatory damages was 4.78:1, 7:1, and 4:1).

In support of its decision to award $300,000.00 in punitive damages, the trial court explained,

> [Claney's] malicious defamation qualifies for punitive damages. [The trial court's] decision on the amount of punitive damages at Count III was guided in part by evidence that Claney paid cash consideration of $403,200[.00] to purchase ICTV preferred stock in May 2018. [The trial court] considered this available liquidity as evidence of Claney's wherewithal in assessing his financial status in the context of a punitive award to Ransom, but [the trial court] had no further information on his wealth or income.

Trial Court Opinion, 1/3/24, at 25.

Upon review, we discern no abuse of discretion in the trial court's decision to award $300,000.00 in punitive damages in favor of Ransom and against Claney. In so doing, the trial court found that "Claney's defamation against Ransom [was] reckless in its insensitivity to the truth and to the dignity and reputation of [Ransom and was the] product of ill[-]will, bad faith, spite, vengeance, and bad motives." Trial Court Findings of Fact and

- 37 -

Conclusions of Law, 1/20/22, at ¶12. The trial court noted that Ransom will continue to suffer "reputational harm" [as] a 45-year old business executive with many years ahead in his career [and the] harm is [only an internet search engine] click away." *Id.* Finally, as the trial court explained, it considered Claney's wealth and liquidity when assessing the punitive damages. As such, the trial court considered the character of Claney's defamatory acts, the nature and extent of the harm Ransom suffered, and will continue to suffer, and Claney's wealth. While Ransom may be dissatisfied with the punitive damage award he received, there is no formula or calculated ratio by which the trial court must assess such an award. Consequently, we discern no abuse of discretion in the trial court's award of $300,000.00.

In his cross-appeal, Claney challenges the joint and several liability imposed on him for Count II – violation of the Pennsylvania Wage Payment and Collection Law.[17] Claney's Brief at 47, 52-53. In light of the trial court's amended judgment entered on July 7, 2023, pursuant to Rule 1703(b), which removed language that Claney was jointly and severally liable for the violation of the Pennsylvania Wage Payment and Collection Law, we find Claney's cross-appeal to be moot.

Judgment affirmed.

---

[17] In his brief, Claney requests that "to the extent that the April 4, 2023 judgment is still in effect, the judgment be vacated[] and the July 6, 2023 amended judgment be given full effect." Claney's Brief at 52 (extraneous capitalization omitted).

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: 2/10/2025